**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **IN THE MATTER OF EXTRADITION** | ) | |
| | ) | |
| | ) | |
| **OF** | ) | **Civil Action No.: 7:12MC39** |
| | ) | |
| **ALMAZ NEZIROVIC** | ) | |
| | ) | |
| | ) | **By: Hon. Robert S. Ballou** |
| | ) | **United States Magistrate Judge** |

## MEMORANDUM OPINION AND ORDER

The Government of Bosnia and Herzegovina ("Bosnia") has requested the extradition of

Almaz Nezirovic ("Nezirovic"), pursuant to the Extradition Treaty between the United States of

America and the Kingdom of Servia (as Serbia was then translated) for the Mutual Extradition of

Fugitives from Justice, signed at Belgrade October 25, 1901 and entered into force June 12, 1902

(the "Extradition Treaty") and the United Nations Convention Against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment, done at New York December 10, 1984 and

entered into force June 26, 1987 (for the United States, November 20, 1994), S. Treaty Doc. No.

100-200, 1465 U.N.T.S. 85 (the "CAT"). After considering the full record, the parties' briefs,

the relevant treaty and conventions, and the applicable standards, the court **CERTIFIES**

Nezirovic as subject to extradition under 18 U.S.C. § 3184.

## I.     FACTS AND PROCEDURAL HISTORY

On July 16, 2012, the United States, on behalf of the government of Bosnia, filed a

complaint to extradite Nezirovic pursuant to the Extradition Treaty and the CAT. Nezirovic is

wanted by Bosnia for trial on the charge of War Crimes against Civilians in violation of Article

1

142, paragraph 1 of the Criminal Code of the former Socialist Federal Republic of Yugoslavia (the "SFRY"), which was effective at the time of the charged crime and remains in effect in present day Bosnia.

Nezirovic is a native and citizen of Bosnia, who entered the United States in 1997 as a refugee. These charges arise out actions that allegedly occurred from April to July of 1992, during the Bosnian War. In March 1992, Nezirovic's hometown of Derventa was attacked by Serbian troops. In April 1992, Nezirovic, a Bosniak, joined a paramilitary group, the HVO, and became a prison guard at the Rabic prison camp in Derventa. Bosnia charges that while serving in that capacity, Nezirovic committed war crimes against civilians, more specifically, beating, humiliating, and traumatizing unarmed civilian prisoners causing severe personal injury.

On January 12, 1993, the Doboj Police Department of Bosnia issued a Criminal Report against 127 persons, including Nezirovic, charging him with the criminal offense of War Crimes against Civilians under Article 142 of the adopted Criminal Code of the SFRY. Specifically, the Criminal Report alleged the following as to Nezirovic:

> [t]he reported Almaz Nezirovic, in the period from 4 to 6 months of 1992 in Derventa, as a member of the HVO or the BiH TO took part in mass unlawful arrests and detention of persons of Serb ethnicity. He especially stood out in physical abuse and in May 1992 in the Rabic camp on several occasions he forced detainees to place three fingers on the table and then with other reported persons he would beat them with a baton on their fingers and on other parts of their bodies, and on that occasion he inflicted serious bodily injuries on Boro Markovic, son of Nedo, Milorad Gunjevic, Milo Kuzmanovic, Luka Patkovic, Dr. Zeljko Stajcic, Xdravko Vidovic, Milovan Adzic and Ilija Cuk.
>
> On 30 May 1992, together with Angijad Jusanovic the reported person took part in beating Dr. Zelijko Stajcic with a baton all over his body, on which occasion he sustained a serious bodily injury consisting of a left arm calvicular fracture.

A warrant for Nezirovic's arrest was issued in Bosnia on May 28, 2003, by the Investigative Judge of the District Court in Doboj. On July 9, 2012, Bosnia submitted a formal request to the United States Department of State, for Nezirovic's arrest, extradition and

surrender.  On July 30, 2012, Bosnia provided supplemental documentation in support of its application for the extradition of Nezirovic, including statements of twenty-one witnesses alleging that Nezirovic committed acts of torture, including beating detained civilians using his arms and legs, his rifle, batons or sticks; threatening prisoners with death; and humiliating the prisoners by forcing them to remove their clothing and crawl on the ground, to put their noses in others' anuses, and to eat grass on which others had urinated.

Nezirovic was arrested on a complaint for provisional arrest pending extradition on July 17, 2012, and is in custody within this District pending final disposition of this matter by the Secretary of State.  On September 7, 2012, this court conducted an evidentiary hearing.  The court granted the parties leave to file supplemental briefs on the legal issues presented at the evidentiary hearing, and on November 19, 2012, the court held a final oral argument hearing. The request for certification is now ripe for decision.

## II. ANALYSIS

### A.  Procedural Requirements:

The extradition of a fugitive from the United States to Bosnia is governed by the provisions of the federal extradition statutes, 18 U.S.C. §§ 3181 et seq., and the Extradition Treaty between the United States and Bosnia.  Every extradition request requires the court to find that  1) the judicial officer has jurisdiction to conduct an extradition proceeding; 2) the court has jurisdiction over the fugitive; 3) the person before the court is the fugitive named in the request for extradition; 4) there is an extradition treaty in full force and effect; 5) the crimes for which surrender is requested are covered by that treaty; and 6) there is competent legal evidence to support the finding of probable cause as to each charge for which extradition is sought.  Eain v. Wilkes, 641 F.2d 504, 508 (7th Cir.1981); In re Rodriguez Ortiz, 444 F. Supp. 2d 876, 881-82

(N.D. Ill. 2006) (citing <u>Fernandez v. Phillips</u>, 268 U.S. 311, 312, 45 S. Ct. 541, 69 L. Ed. 970 (1925); <u>In re Extradition of Fulgencio Garcia</u>, 188 F. Supp. 2d 921, 925 (N.D.Ill.2002)). Upon finding sufficient evidence to support extraditing the fugitive, the court then certifies him as extraditable to the Secretary of State, who ultimately decides whether to surrender him to the requesting country. 18 U.S.C. §§ 3184, 3186, 3196.

Nezirovic raises three challenges to his extradition. First, Nezirovic contends that the Extradition Treaty does not permit his extradition because the charges against him have become barred by the statute of limitations. Second, Nezirovic argues that his actions amount to political offenses for which extradition is not appropriate. Finally, Nezirovic asserts that Bosnia seeks his extradition only to prosecute him for political purposes. The court has considered these claims, as well as each factor required under § 3184, and concludes that sufficient cause exists to certify Nezirovic as extraditable to the Secretary of State.

**1. Jurisdiction of the Judicial Officer**

The extradition statutes expressly allow federal magistrate judges to hear and decide extradition cases if "authorized to do so by a court of the United States." 18 U.S.C. § 1384. The jurisdiction of federal magistrate judges in extradition proceedings has been repeatedly upheld as being consistent with Article III of the Constitution. <u>In re Rodriguez Ortiz</u>, 444 F. Supp. 2d at 882 (citing <u>Ward v. Rutherford</u>, 921 F.2d 286, 289 (D.C. Cir.1990)). <u>See</u> <u>DeSilva v. DiLeonardi</u>, 181 F.3d 865, 867 (7th Cir. 1999)("Congress has authorized magistrate judges to act on behalf of the district court in authorizing extradition."); <u>Austin v. Healey</u>, 5 F.3d 598, 601-02 (2nd Cir. 1993) (finding that the magistrate judge had authority to conduct the extradition hearing without

any specific delegation of responsibility in the case). Thus, this court is authorized to conduct the extradition proceeding.[1]

### 2. Jurisdiction over the Fugitive

This court has jurisdiction in an extradition proceeding over any person found within the jurisdiction of the court. 18 U.S.C. § 3184. Nezirovic was found in the Western District of Virginia and is currently in federal custody here; thus, this court has the requisite personal jurisdiction to make an extradition determination.

### 3. Identity of the Fugitive

Nezirovic does not dispute that he is the Almaz Nezirovic sought by Bosnia and named in the Complaint filed in this court. Nezirovic's Mot. to Dismiss, p. 11 (Dkt. No. 19). Based upon the identifiers contained in the extradition request and supporting documents, and the evidence submitted at the hearing, I find that Nezirovic is the person named in the Compliant and sought for extradition to Bosnia.

### 4. Existence of Extradition Treaty

Extradition is proper only where there is a treaty in force between the requesting country and the United States. 18 U.S.C. §§ 3181(a), 3184. See also In re Rodriguez Ortiz, 444 F. Supp. 2d at 882. The court finds that the two relevant instruments in this case, the Extradition Treaty between the United States and Bosnia, and the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "CAT"), are both in full force and effect between the United States and Bosnia.

---

[1] The appointment order in this court entered October 3, 2011 authorized the undersigned "to perform all . . . functions and duties as may be permitted under any statute of the United States or by local rule of the Court." W.D. Va. Standing Order, Appointment of Judge Robert S. Ballou.

### a. The Treaty Applies Under State Succession Doctrine

The United States signed the Extradition Treaty with the Kingdom of Servia (as Serbia was then translated) on October 25, 1901, which became effective and entered into force on June 12, 1902. Gov't Ex. 1 (Dkt. No. 8-1). The Extradition Treaty applies to Bosnia under the "state succession" doctrine, as a successor state to the formal Federal Peoples' Republic of Yugoslavia, which was, in turn, a successor state to the Kingdom of Serbia. Sacirbey v. Guccione, 589 F.3d 52, 56 n.8 (2nd Cir. 2009). Courts consistently recognize state succession with regard to extradition treaties, and will presume state succession unless the successor state explicitly rejects a given treaty. Arambasic v. Ashcroft, 403 F. Supp. 2d 951, 955 (D.S.D. 2005). Nezirovic presented no evidence that Bosnia has rejected the treaty between the United States and Serbia; and multiple courts examining the history of the Extradition Treaty have found that it is in full force and effect. See, e.g., Skaftouros v. United States, 667 F.3d 144, 151 n.10 (2d Cir. 2011) (Bosnia "is a successor to the Kingdom of Serbia and thus a successor party to the treaty of extradition between the United States and the Kingdom of Serbia"); Artukovic v. Rison, 784 F.2d 1354, 1356 (9th Cir. 1986) ("We have long held that the 1902 treaty is valid and effective now even though Yugoslavia did not exist as a political unit at the time the treaty was signed"); In the Matter of the Extradition of Handanovic, 829 F. Supp. 2d 979, 986 (D. Or. 2011) ("[T]he 1902 treaty remains a valid extradition treaty between the United States and [Bosnia] . . .."); In re Extradition of Azra Basic, No. 5:11-MJ-5002, 2012 WL 3067466, at *3 (E.D. Ky. July 27, 2012) (re-affirming prior finding that the Extradition Treaty applies as to Bosnia); In Re Extradition of Bilanovic, No. 1:08-MJ-74, 2008 WL 5111846, at *6 (W.D. Mich. Dec. 3, 2008)(noting that "[n]o court has held otherwise"); United States v. Avdic, No. CR. 07-M06, 2007 WL 1875778, at *2, *6 (D.S.D. June 28, 2007) (finding the Extradition Treaty in full force and effect).

### b. The Convention Against Torture Supplements the Extradition Treaty

Little doubt exists that both the United States and Bosnia have signed onto the CAT and that this treaty supplements the Extradition Treaty. "The Convention Against Torture has over 140 signatory nations including the United States…" Melaj v. Mukasey, 282 Fed. App'x 354, 359-60 (6th Cir. 2008). The United States became a signatory to the CAT in New York on December 10, 1984, which entered into force June 26, 1987 (for the United States, November 20, 1994). Bosnia succeeded to the CAT and provided a formal instrument of succession to the U.N. Secretary-General on September 1, 1993, with "effect from 6 March 1992." Status of the International Covenants on Human Rights, E/CN.4/1994/68 ¶ 18. See also Basic, 2012 WL 3067466, at *3. I find that both the United States and Bosnia are parties to and bound by the CAT.

The court gives substantial weight to the determination of the government's political departments on whether a treaty is still in effect. See Arambasic v. Ashcroft, 403 F. Supp. 2d 951, 955 (D.S.D. 2005). Here, Jason A. Biros, an attorney in the Office of the Legal Adviser for the Department of State, attests that both the Extradition Treaty and the CAT are in full force and effect between the United States and Bosnia. Decl. of Jason Biros, p. 1-2 (Dkt. No. 18-2). See Rodriguez Ortiz, 444 F. Supp. 2d at 882 (relying on a similar declaration in finding a treaty with Mexico to be in full force and effect). The court also notes that Nezirovic does not contest either the existence or applicability of both the Extradition Treaty and the CAT in these proceedings. Accordingly, I find that both the Extradition Treaty and the CAT are in full force and effect between the United States and Bosnia. The applicability of the CAT is significant in that it supplements the Extradition Treaty and the offenses contained in the CAT are made a part of the

Extradition Treaty, and thus, through ratification of the CAT and the enactment of the Torture Act, the government seeks the extradition of Nezirovic to Bosnia.

### 5. Extradition Treaty Encompasses the Crimes

Extradition is proper only where the extradition treaty includes the crime charged in the complaint. See 18 U.S.C. § 3184. Bosnia seeks the extradition of Nezirovic to answer the criminal charges for "War Crimes against Civilians, including torture and inhuman treatment, in violation of Article 142, paragraph 1 of the Criminal Code of the Socialist Federal Republic of Yugoslavia ('Yugoslavia' or the 'SFRY')(effective at the time of the charged crime(s) in what is now Bosnia and Herzegovina.)" Compl. (Dkt. No. 3). Specifically, Bosnia charges Nezirovic with beating, threatening, torturing and inhumanely treating detained Serbian civilians, causing serious physical and emotional injuries. Compl. (Dkt. No. 3).

The analysis of whether the Extradition Treaty encompasses the charge against Nezirovic depends upon whether the Extradition Treaty is a "list" or "dual criminality" treaty. A list treaty requires only that the offenses charged against Nezirovic be specifically enumerated or "listed" in the treaty. Dual criminality treaties require the additional finding that the particular charge constitutes criminal conduct under the laws of both countries. In Re Extradition of Handanovic, 829 F. Supp. 2d at 989. The Government argues that the Extradition Treaty is properly characterized as a "list" treaty (Gov't Memo. in Supp. of Extradition, p. 22 (Dkt. No. 18)), while Nezirovic argues that the Extradition Treaty requires a "dual criminality" analysis (Nezirovic Mot. to Dismiss, p. 13 (Dkt. No. 19)). Both parties agree that, under either analysis, the charges against Nezirovic are covered by the terms of both the Extradition Treaty and the CAT. See Gov't Memo in Supp. of Extradition, p. 22 (Dkt. No. 18); Nezirovic Mot. to Dismiss, pp. 13-14 (Dkt. No. 19); Nezirovic Memo. in Supp. of Mot. to Dismiss, pp. 12-13 (Dkt. No. 37).

Article I of the Extradition Treaty provides for the extradition of persons "charged with or convicted of any of the crimes and offenses" specified in Article II, which include murder, attempted murder, arson, robbery, forgery, and other specifically delineated crimes, provided that

> this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial if the crime or offense had been committed there.

Treaty, Art. I. Article II further provides:

> Extradition is also to take place for participation in any of the crimes and offenses mentioned in this Treaty, provided such participation may be punished in the United States as a felony and in Servia as crime or offense as before specified.

Treaty Art. II. (Dkt. No. 8-1).

Treaties are construed liberally to favor the obligation to surrender fugitives. In Re Extradition of Handanovic, 829 F. Supp. 2d at 989. In this case, Article II of the Extradition Treaty does not list "war crimes" or "torture" as extraditable offenses. However, the CAT, which supplements the Extradition Treaty, incorporates, as listed offenses, torture and inhuman treatment, the very conduct charged against Nezirovic, as "listed" offenses in the Extradition Treaty. In re Extradition of Azra Basic, 2012 WL 3067466, at *4 (E.D. Ky. July 27, 2012). See also In Re Extradition of Handanovic, 829 F. Supp. 2d at 989 (construing the same Extradition Treaty, the court stated "extradition for war crimes may be permissible even though the treaty does not specifically designate those crimes in the list of extraditable offenses, as long as the underlying conduct constitutes an extraditable offense.")(citing Artukovic v. Rison, 784 F.2d 1354, 1356 (9th Cir. 1986)); Demjanjuk v. Petrovsky, 776 F.2d 571, 579 (6th Cir. 1985)).

The CAT requires that all signatory countries make acts of torture punishable under the criminal laws of that country. See Art. 4, § 1. Article 8 of the CAT declares that acts of torture,

attempts to commit torture or any complicity or participation in torture are offenses in the extradition treaties between the signatory parties. Thus, when the United States and Bosnia entered into the CAT, torture became an extraditable offense under the Extradition Treaty. See Basic, 2012 WL 3067466, at *3, *4. Furthermore, Jason Biros stated in his Declaration that "pursuant to Article 8 of the Torture Convention, torture and conspiracy to commit torture, which are offenses established in accordance with Article 4 of that convention, are deemed to be included as extraditable offenses in the 1902 Treaty." Decl. of Jason Biros, p. 2 (Dkt. No. 18-2). See In Re Extradition of Garcia, 825 F. Supp. 2d 810, 828 (S.D. Tex. 2011)( the opinion of the State Department on whether a crime is covered by a treaty "is entitled to weight and deference").

The CAT defines "torture" as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." CAT, Art. 1, § 1. This definition of "torture" captures the specific conduct that underlies the charges against Nezirovic – that he intentionally inflicted severe pain upon persons under his control while a guard at the Rabic prison camp.

The offenses for which Nezirovic stands charged are also extraditable under a dual criminality analysis. Dual criminality requires that the acts upon which the extradition request is founded be considered a crime by the laws of both countries. In re Extradition of Cervantes Valles, 268 F. Supp. 2d 758, 770 (S.D. Tex. 2003). Dual criminality exists if the essential character of the acts criminalized by the law of each country is the same and if the laws are

substantially analogous.  <u>Oen Yin-Choy v. Robinson</u>, 858 F.2d 1400, 1404-05 (9th Cir. 1988).

Nezirovic has been charged in Bosnia with War Crimes against Civilians, including torture, in

violation of Article 142, paragraph 1 of the Criminal Code of the SFRY, which states, as relevant

here, that

> [w]hoever in violation of rules of international law effective at the time of
> war, armed conflict or occupation, orders….that the civilian population be
> subject to …torture…[or] immense suffering or violation of bodily integrity
> or health…,[or] who commits some of the forgoing acts, shall be
> punished…

Gov't Memo. in Supp. of Extradition, Ex. C., p. 27 (Dkt. No. 18-4).  Accordingly, there is no

question that the acts for which Nezirovic has been charged are considered criminal under

Bosnian law.  Likewise, the alleged actions of Nezirovic  are criminalized under 18 U.S.C. §

2340A (the "Torture Act"), which states, "[w]hoever outside the United States commits or

attempts to commit torture shall be fined under this title or imprisoned…" 18 U.S.C. § 2340A.

The Torture Act defines torture as "an act committed by a person acting under the color

of law specifically intended to inflict severe physical pain or suffering . . . upon another person

within his custody or physical control."  18 U.S.C. § 2340.  The United States enacted the

Torture Act in 1994 when it ratified the CAT, but after Nezirovic allegedly committed the acts

for which he is charged.  The court looks, however, only to the treaties and law in effect at the

time the extradition demand is made.  "The law pertinent to the question of extradition is the law

in force *at the time of the demand*."  <u>In the Matter of the Extradition of Murphy</u>, No. 98-M-168,

1998 WL 1179109, at *5 n.3 (N.D.N.Y. June 30, 1998) (emphasis original) (citing <u>Hilario v.</u>

<u>United States</u>, 854 F. Supp. 165, 176 (E.D.N.Y. 1994)).  Thus, the conduct underlying the

charged offenses is criminal in both nations, and the crimes for which Nezirovic is charged are

encompassed by the Extradition Treaty.

### 6. Probable Cause

Section 3184 requires that the court assess whether "the evidence is sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. The Extradition Treaty states that extradition shall be granted if "such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his or her apprehension and commitment for trial if the crime or offense had been committed there." Extradition Treaty, Art. I. Courts have interpreted this type of treaty language to require a showing by the requesting party that there is probable cause to believe that the accused has committed the charged offense. United States v. Kin-Hong, 110 F.3d 103, 117 (1st Cir. 1997). This probable cause standard in an extradition proceeding "is the same as the standard used in federal preliminary hearings." Hoxha v. Levi, 465 F.3d 554, 561 (3rd Cir. 2006); In the Matter of the Extradition of Garcia, 825 F. Supp. 2d at 828-29. Thus, the court must determine whether, on the record submitted, there is a reasonable basis to believe that Nezirovic committed the crimes charged. Basic, 2012 WL 3067466, at *5.

Nezirovic does not contest that the complaint states sufficient facts to support a finding of probable cause that he committed the acts charged by Bosnia. (Nezirovic Mot. to Dismiss, p. 11 (Dkt. No. 19)). Indeed, the record supports an independent finding of probable cause to believe that Nezirovic committed the crimes charged. Specifically, the record in this case contains: 1) the Prosecutor's Declaration in Support of Extradition, which includes twenty-one witness statements describing the specific acts for which Nezirovic is charged (Gov'ts Memo. in Supp. of Extradition, Ex. C. (Dkt. No. 18-4)); 2) the Order to Conduct an Investigation and supporting evidence listed therein issued by the District Public Prosecutor's Office of Doboj dated November 12, 2003 (Gov'ts Memo. in Supp. of Extradition, Ex. C. (Dkt. No. 18-4)); 3) the

Affidavit of Michael B. Tarantino, Special Agent with United States Department of Homeland Security, Homeland Security Investigation, Immigration and Customs Enforcement (Gov'ts Memo. in Supp. of Extradition, Ex. C. (Dkt. No. 18-4)); and, 4) the criminal charge issued against Nezirovic by the Doboj Police Department on January 12, 1993 (Dkt. No. 20-1). This evidence establishes a reasonable basis to believe that Nezirovic beat, threatened, tortured and inhumanely treated detained Serbian civilians, causing severe physical and emotional injuries. Consequently, I find that the complaint states sufficient probable cause to believe that Nezirovic committed war crimes against civilians in violation of Article 142, paragraph 1 of the Criminal Code of the SFRY.

Having made each of the findings required in an extradition proceeding, I now consider whether any of the defenses raised will preclude certifying Nezirovic to the Secretary of State for extradition to Bosnia.

## B. Statute of Limitations

Nezirovic correctly points out that Article VII of the Extradition Treaty bars extradition if the applicable statute of limitation in the United States has expired.

> Extradition shall not be granted, in pursuance of the provisions of this Treaty, if legal proceedings or the enforcement of the penalty for the act committed by the person claimed has become barred by limitation, according to the laws of the country to which the requisition is addressed.

Treaty at Art. VII (Dkt. No. 8-1); see also Restatement (Third) of Foreign Relations Law § 476(1)(d) (1987) (noting that under most international agreements, state law, and state practice, a person will not be extradited if the applicable period of limitation has expired). Thus, the court must determine whether prosecution of Nezirovic for acts committed in 1992 is time barred according to the laws of the United States, or if the limitation period has been time tolled for any period.

Nezirovic first argues that the Torture Act, 18 U.S.C. § 2340, et seq., cannot provide the applicable limitation period because it did not exist in 1992 when Bosnia alleges that Nezirovic engaged in war crime activity. Thus, Nezirovic asserts that utilizing the Torture Act to analyze the limitations period would violate the prohibitions against *ex post facto* laws. Second, Nezirovic contends that because the United States could not prosecute him under the Torture Act, he is not subject to "apprehension and commitment to trial" in this country as required under Article I of the Extradition Treaty. Finally, Nezirovic argues that the 1993 Criminal Report did not initiate a prosecution of him, and thus would not toll the running of any applicable limitation period.

**1. The Relevant Statute of Limitation Has No Limit and Does Not Bar Extradition**

*a. The Torture Act*

As a threshold matter, the court must determine whether the Torture Act can provide the applicable limitation period, and thus, whether Bosnia's attempt to prosecute Nezirovic for actions in 1992 are time barred in the United States. This requires the court to first determine the substantive offense under United States law most closely analogous to the charges Bosnia has asserted against Nezirovic, and then apply the statute of limitations applicable to that offense. See Sainez v. Venables, 588 F.3d 713, 716 (9th Cir. 2009) (citing In re Extradition of Suarez-Mason, 694 F. Supp. 676, 686 (N.D. Cal. 1988)) (interpreting a similar treaty provision; see also In re Extradition of Johnson, 2012 WL 4973938, at *8 (W.D. Pa. Oct. 17, 2012) (quoting Sainez, 588 F.3d at 716).

Nezirovic asserts that the Torture Act was not in effect in 1992, and thus, the most analogous federal crime at the time was simple assault, 18 U.S.C. § 111, for which a five year limitation period applies for non-capital offenses. See 18 U.S.C. § 3282. The government contends that the court should apply the statute of limitations set forth in the Torture Act,

18 U.S.C. § 2340A, which has an eight year limitation period for the prosecution of torture, but no limitation where the offense charged "resulted in or created a foreseeable risk of death or serious bodily injury to another." See 18 U.S.C. § 3286(b). The government contends that there is no limitation period under the Torture Act because the crimes charged against Nezirovic involved torture with a serious risk of physical injury. See 18 U.S.C. § 3286(b).

I find that the Torture Act is the most analogous statute under United States law applicable to the Extradition Treaty. Bosnia charges that Nezirovic engaged in acts which constitute torture against civilians and prisoners while he served as a guard at the Rabic camp. The evidence submitted with the extradition request asserts that Nezirovic's actions resulted in, or created a foreseeable risk of, death or serious bodily injury to another person, and thus, under § 3286(b) there is no limitation period.[2] As explained below, the court determines the applicable limitation period based upon the laws in effect at the time of the extradition request and not when the acts allegedly occurred.

### b. Ex Post Facto Concerns Are Inapplicable In the Context of Extradition

Nezirovic asserts that the Torture Act is inapplicable because it did not become effective until 1994 – two years after the acts for which he is charged, and that any effort to use the Torture Act to determine the applicable limitation period violates the prohibition against *ex post facto* laws. Collins v. Youngblood, 497 U.S. 37, 42 (1990) ("It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done . . . is prohibited as *ex post facto*." (quoting Beazell v. Ohio, 269 U.S. 167, 169-70 (1925)). Nezirovic asserts that under the

---

[2] More specifically, 18 U.S.C. §3286(b) states that no limitation shall apply for any offense listed in 18 U.S.C. §2332b(g)(5)(B) if the commission of such offense resulted in, or created a foreseeable risk of, death or seriously bodily injury to another person. 18 U.S.C. §2332b(g)(5)(B)(i) lists, among other statutes, 18 U.S.C. §2340A.

Extradition Treaty, therefore, the charges he faces in Bosnia for war crimes and torture are not crimes for which he could be prosecuted in the United States under the Torture Act.

"[E]xtradition is not punishment for crime, though such punishment may follow extradition; therefore all talk of ex post facto legislation . . . is quite beside the mark." <u>U.S. ex rel. Oppenheim v. Hecht</u>, 16 F.2d 955, 956 (2d Cir. 1927).  Extradition treaties, unless containing a clause to the contrary, cover offenses committed prior to the date ratified by a country.  <u>Id.</u> (internal citation omitted); <u>see also</u> <u>Matter of Extradition of Demjanjuk</u>, 612 F. Supp. 544, 568 (N.D. Ohio 1985) ("An extradition treaty is to be given retroactive effect, absent an explicit reference in the treaty to the contrary." (citing <u>Gallina v. Fraser</u>, 177 F. Supp. 856, 864 (D. Conn. 1959))).  Indeed, "more than 100 years of precedent ha[s] held that extradition treaties are not subject to the constitutional prohibition against *ex post facto* laws and c[an] be applied even where the subject of the extradition request had an absolute defense to extradition prior to the ratification of the treaty."  <u>In Matter of Extradition of Ernst</u>, 97 CRIM.MISC.1 PG.22, 1998 WL 395267, at *13 (S.D.N.Y. July 14, 1998) (collecting cases) (finding a 1997 extradition treaty retroactively applied, relying in part on this long history of precedent).

The fact that extradition treaties can, and generally do, apply to conduct occurring before their enactment supports the view that the legislature can enact a new criminal statute which causes conduct that occurred before the effective date of the new statute to become an extraditable offense.  In <u>U.S. ex rel.Oppenheim v. Hecht</u>, the Second Circuit stated that "[i]f asylum is [] destroyed by the making of a treaty, a fortiori is it taken away when one of the high contracting parties somewhat belatedly recognizes [an act] as criminal." <u>Oppenheim</u>, 16 F.2d at 957.  In <u>Oppenheim</u>, the petitioner was indicted in Scotland for certain acts of bank fraud, which when committed were not crimes in the United States.  Petitioner became subject to extradition

when Congress amended the bankruptcy laws to make the alleged acts illegal and which then

satisfied the dual criminality requirements of the extradition treaty. The Second Circuit rejected

the petitioner's claim that he was immune from extradition because the acts were not criminal in

the United States when committed. The court stated,

> Extradition proceedings are not in their nature criminal, even if the relator is a criminal; extradition is not punishment for crime, though such punishment may follow extradition; therefore all talk of ex post facto legislation, or of the niceties of common law on the criminal side, or of the niceties of common law on the criminal side [sic], is quite beside the mark. Glucksman v. Henkel, 221 U.S. 508, 31 S. Ct. 704, 55 L. Ed. 830; Grin v. Shine, 187 U.S. 181, 23 S. Ct. 98, 47 L. Ed. 130.

> In principle, the point submitted was completely covered by In re De Giacomo, 12 Blatch. 391, Fed. Cas. No. 3747, where the relator sought refuge in this country from the law of Italy, before any extradition treaty existed between the two governments; when one was arranged, it was held to authorize the fugitive's surrender. The authority of this decision by Blatchford, J., has never been challenged. Cohn v. Jones (D.C.) 100 F. 639, is not opposed, and is we think, irrelevant, while In re Taylor (D.C.) 118 F. 196, covers a wholly different point, viz. that the relator never committed any crime against the demanding government, an admittedly fatal defect, if true in fact.

> The rule is thus stated by the highest modern American Authority:

> 'Extradition treaties, unless they contain a clause to the contrary, cover offenses prior to their conclusion,' and, 'where no special stipulation on the subject is made, the exchange of ratifications has a retroactive effect.' Digest of International Law, vol. 4, p. 268 et seq., by Hon. Jno. Bassett Moore, now of the World Court.

U.S. ex rel. Oppenheim v. Hecht, 16 F.2d 955, 956 (2d Cir. 1927).

The Northern District of California refused to follow Oppenheim in United States v.

Wathne, CR 05-0594 VRW, 2008 WL 4344112, at *11-13 (N.D. Cal. Sept. 22, 2008), finding

that Oppenheim's holding that a determination of dual criminality refers to the time of the

extradition request and not the time of the conduct has never been followed. In Wathne, a

defendant sought to dismiss an American indictment on the ground that his extradition from

India violated the dual criminality requirements of the particular extradition treaty with India. The court based its decision on how it believed an Indian court would construe the dual criminality requirement of the extradition treaty, and concluded that an Indian court would require that an extraditable offense be criminal in both countries at the time of the conduct.

I find the conclusions reached in <u>Oppenheim</u> more persuasive in that the determination of whether the offense charged satisfies the dual criminality requirement of the Extradition Treaty is determined based upon the Extradition Treaty and criminal laws in effect at the time of the extradition request and not when the alleged acts occurred. Consequently, it follows that as the legislature may retroactively categorize particular behavior as extraditable as the court permitted in <u>Oppenheim</u>, it also has the power to retroactively extend the applicable statute of limitations as occurred in this case with the enactment of the Torture Act. <u>Cf.</u> <u>Matter of Extradition of McMullen</u>, 989 F.2d 603, 611 (2d Cir. 1993) (finding that Congress did not enact a bill of attainder by passing a supplementary treaty which narrowed the scope of the "political offense" exception in the extradition treaty with the United Kingdom, thereby allowing the extradition of an individual whose conduct had been found to be a political offense under the old definition). Congress, by enacting the Torture Act and the concomitant statute of limitations, effectively made torture an extraditable offense under the Extradition Treaty and likewise made 18 U.S.C. §3286(b) the applicable statute of limitations. These retroactive changes are not forbidden as *ex post facto* in the context of an international extradition, a non-criminal proceeding.

As extradition is a matter of foreign policy, the President and Congress are given wide latitude to enact treaties to further the interests of the nation. Congress likewise may enact statutes which permit the enforcement of the extradition provisions of a treaty. The <u>Oppenheim</u>

court makes clear that the enactment of a criminal statute which clears the way to extradite an individual to another country for prosecution of acts committed earlier is not an *ex post facto* law. The passage of the Torture Act does not criminalize the alleged conduct of Nezirovic in Bosnia. Indeed, the attempted prosecution of Nezirovic in Bosnia is based upon laws in effect in 1992. The Torture Act may open the door to permit extradition of Nezirovic to Bosnia. That, however, does not implicate the *ex post facto* protections of our constitution.

### c. The Extradition Treaty Does Not Require Determining Whether Nezirovic is Subject to Prosecution in the United States

Similar to his *ex post facto* argument, Nezirovic argues that Article I of the Extradition Treaty requires that the court determine whether he could be prosecuted in the United States. Article I of the Extradition Treaty requires evidence of "criminality as …would justify his or her apprehension and commitment for trial if the crime or offense had been committed [in the United States]." Extradition Treaty, (Dkt. No. 8-1)

Article I establishes that the proper evidentiary standard and the quantum of proof required to certify Nezirovic for extradition is that evidence sufficient to arrest and for trial of a defendant had he been charged in the United States. This is the well-known probable cause standard necessary for charging a criminal defendant either by indictment or criminal complaint. In Matter of Extradition of Betrand, 85-0158J-01, 1986 WL 8845 (D.N.J. June 13, 1986), the court was charged with interpreting the extradition treaty between the United States and Switzerland, which included the following language:

> [T]his [surrender of a person charged with a Swiss crime] shall be done by the United States only upon such evidence of criminality as, according to the laws of the place where the fugitive or person should be found, would justify his apprehension and commitment for trial if the crime or offense had been there committed . . . .

Id. at *4.  The court found this language "speaks [] to the quantum of evidence which is required to extradite, which is equivalent to the quantum of proof required for arrest and commitment for trial, namely the 'probable cause' standard."  Id.  This court, faced with the same language, reaches the same conclusion that Article I speaks only to the evidence necessary to satisfy the probable cause burden for extradition.

Article I does not require that Nezirovic be subject to prosecution under the laws of the United States, nor does the Extradition Treaty invoke a particular period of limitation or even require that the alleged acts have been illegal when committed. Just as in the dual criminality analysis, "[t]he law pertinent to the question of extradition is the law in force *at the time of the demand*."  In the Matter of the Extradition of Murphy, No. 98-M-168, 1998 WL 1179109, at *5 n.3 (N.D.N.Y. June 30, 1998) (emphasis original) (citing Hilario v. United States, 854 F. Supp. 165, 176 (E.D.N.Y. 1994)).[3]

 Nevertheless, Nezirovic argues that this court should follow the decision of In re Extradition of Azra Basic, where the court found that it could not apply the Torture Act's statute of limitations to 1992 conduct under Article VII of the Extradition Treaty. 2012 WL 3067466, at *14 (E.D. Ky. July 27, 2012).  Basic involved an extradition proceeding under the same Extradition Treaty in which the Bosnian government had charged Basic with significant war crime activity.  Basic urged that she was not subject to extradition for certain crimes because the Torture Act was not in effect at the time she allegedly committed her crimes.  The court held that "[i]f there could be no legitimate prosecution under § 2340A, under *ex post facto* principles, it

---

[3] Other cases, while not addressing the issue directly, have clearly looked to the current state of the law when determining the appropriate statute of limitations in the context of international extraditions—not what the law was at the time of the alleged act.  See United States v. Garfias, CR-09-XR-90128 EMC, 2009 WL 2580641 (N.D. Cal. Aug. 20, 2009) (determining the application statute of limitations in the international extradition context and noting that there *is* no statute of limitations for first degree murder under federal law); In re Extradition of Fulgencio Garcia, 188 F. Supp. 2d 921, 927 (N.D. Ill. 2002) (doing the same and making the same present tense observation of Illinois law).

would make no sense to analyze timeliness premised on that (inapplicable) statute." Id. at *14. The Basic court acknowledged that the applicable laws and procedures in extraditions are generally those in force at the time of the extradition, but nevertheless found that the Extradition Treaty requires "a substantive analysis of timeliness of prosecution" in assessing "a hypothetical prosecution, on American soil, of the conduct." Id. at *14 n.20.  As such, the Basic court found that it could not apply the Torture Act's statute of limitations to 1992 conduct under Article VII of the Extradition Treaty. Id. at *14.  Instead the court found that "any torture prosecution, irrespective of substantive basis, would fall under the general non-capital limitations period [of five years set by] 18 U.S.C. § 3282(a)." Id.

The Basic court cites no authority for the conclusion that assessing the extradition request requires determining whether the individual would be subject to a hypothetical prosecution on American soil for the same acts.  The conclusion reached by the Basic court is contrary to the express language of the Extradition Treaty and the overwhelming authority holding that the law in force at the time of the demand controls the extradition analysis.  The inquiry under Article VII is only whether the relevant statute of limitations has expired.  The language in the Extradition Treaty does not suggest that the court consider the substantive elements of the charges beyond determining whether probable cause exists that Nezirovic committed the alleged offenses.  The United States Constitution and its laws may afford many protections and defenses against prosecution in this country.  Those considerations are not part of the treaty agreement governing this extradition proceeding and are not part of this court's analysis.  In short, international extraditions are a matter of foreign affairs, not law enforcement.  See, e.g., In re Extradition of Exoo, 522 F. Supp. 2d 766, 775 (S.D. W.Va. 2007) ("The power to extradite derives from the President's power to conduct foreign affairs . . . It clearly is not a criminal

proceeding." (quoting <u>Martin v. Warden, Atlanta Pen</u>, 993 F.2d 824, 828 (11th Cir. 1993)).

Double jeopardy and grants of amnesty do not obligate other sovereigns.  <u>See</u> <u>Elcock v. United States</u>, 80 F. Supp. 2d 70, 75 (E.D.N.Y. 2000) ("The Fifth Amendment's protection against double jeopardy extends only to successive prosecutions brought by the same sovereign [and a]s a result [] [d]ouble [j]eopardy . . . does not prevent extradition from the United States for the purpose of a foreign prosecution following prosecution in the United States for the same offense." (internal citations omitted)); <u>United States v. First W. State Bank of Minot, N. D.</u>, 491 F.2d 780, 782 (8th Cir. 1974) ("The United States as a sovereign is not precluded from enforcing its laws by the grant of immunity of another sovereign . . . .").

The foundational elements of domestic criminal law are out of place in the extradition setting. <u>Cf.</u> <u>Skaftouros v. United States</u>, 667 F.3d 144, 155 (2d Cir. 2011) ("By design, the procedural framework of international extradition gives to the demanding country advantages most uncommon to the ordinary civil and criminal litigation." (internal quotation omitted)).  <u>But cf.</u> <u>United States v. Rashed</u>, 234 F.3d 1280, 1282 (D.C. Cir. 2000) (declining to find a blanket rule against the "sham prosecution" exception to the dual sovereignty doctrine in the context of international extraditions).  Courts in general are largely unreceptive to *any* objections to extradition which "savor of technicality."  <u>See, e.g.</u>, <u>In re Extradition of Fulgencio Garcia</u>, 188 F. Supp. 2d 921, 927-28 (N.D. Ill. 2002) (quoting <u>Bingham v. Bradley</u>, 241 U.S. 511, 517 (1916)); <u>see also</u> <u>In re Extradition of Robertson</u>, 11-MJ-0310 KJN, 2012 WL 5199152, at *4 (E.D. Cal. Oct. 19, 2012) (collecting cases).  A highly technical analysis of a hypothetical domestic prosecution, therefore, is not the proper means to determine if Article VII of the Extradition Treaty disallows extradition on a statute of limitations ground.

### 2. Any Relevant Statute of Limitations Would be Tolled

#### a. Foreign Legal Proceedings Must be Given the Fullest Possible Effect

The United States contends that the 1993 Criminal Report filed in Bosnia effectively tolled the statute of limitations on any criminal proceedings in Bosnia, and that the Criminal Report has the same tolling effect on analyzing any statute of limitations issues. The tolling of the statute of limitations matters if the eight year limitation period of the Torture Act or more general five year period for non-capital federal offenses applies. Tolling occurs where some action is taken to initiate a prosecution against Nezirovic. "In the context of an extradition proceeding, where a step is taken in a foreign legal system to toll the statute of limitations that step also tolls the limitation period under United States law." Cherry v. Reish, 96 CIV. 1679 (RPP), 1996 WL 509735, at *3 (S.D.N.Y. Sept. 9, 1996) (citing Caplan v. Vokes, 649 F.2d 1336, 1340-1341 (9th Cir. 1981)), aff'd, 104 F.3d 355 (2d Cir. 1996). The Fourth Circuit has held that extradition proceedings are "grounded in principles of international comity" and that the "primary tenet of comity" is that courts give, whenever possible, "effect to the decisions of foreign tribunals in domestic courts." Haxhiaj v. Hackman, 528 F.3d 282, 290-91 (4th Cir. 2008) (citing Spatola v. United States, 925 F.2d 615, 618 (2nd Cir. 1991)). This recognition "fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations." Id. As such, if the 1993 Criminal Report tolls the statute of limitations under Bosnian law, this court must give the Criminal Report the same tolling effect.

To determine the tolling effect, if any, the Criminal Report may have, this court must analyze the law of Bosnia, but only to "the limited extent necessary to ensure that the requirements of the federal extradition statute and the applicable extradition treaty have been satisfied." Skaftouros, 667 F.3d at 156. Courts have reviewed the foreign charging document

only to determine whether it serves as the "functional equivalent" of an indictment in American

criminal procedure for purposes of charging a defendant and tolling the statute of limitations.

See Sainez v. Venables, 588 F.3d 713, 716-17 (9th Cir. 2009) (finding a Mexican arrest warrant

to be the equivalent of a United States indictment for the purposes of tolling the statute of

limitations in an extradition proceeding (citing Jhirad v. Ferradina, 536 F.2d 478, 480 (2d Cir.

1976))); see also In re Extradition of Nunez, 10-24020-MC, 2011 WL 281030, at *3-4 (S.D. Fla.

Jan. 26, 2011) (discussing Sainez's functional equivalence holding and finding the issuance of an

arrest warrant in Japan tolled the applicable statute of limitations); Restatement (Third) of

Foreign Relations Law § 476 cmt. e (1987) ("For purposes of applying statutes of limitation to

requests for extradition, the period is generally calculated from the time of the alleged

commission of the offense to the time of the warrant, arrest, indictment, or similar step in the

requesting state, or of the filing of the request for extradition, whichever occurs first.").[4]

    The judicial review of the foreign charging document to determine whether it serves as

the "functional equivalent" of an indictment does not involve "attempting to analogize [the

foreign document] to an American indictment." Sainez, 588 F.3d at 717. "Rather, [courts must]

reach [a] conclusion by adhering to [the] established approach of giving credence to foreign

proceedings." Id. (noting that courts decline to rule on the procedural requirements of foreign

law out of respect for other nations' sovereignty); see also Nunez, 2011 WL 281030, at *4

("Without trying to ascertain the nuances of Japanese procedures unfamiliar to this Court, the

Court notes that the arrest warrant and indictment appear to work together in Japan to bring

about the charge of the accused."); but see Matter of Extradition of Betrand, 85-0158J-01, 1986

WL 8845, at *5 (D.N.J. June 13, 1986), (finding that "such drawing of analogies between the

---

[4] In Matter of Assarsson, 687 F.2d 1157, 1162 n.8 (8th Cir. 1982), the Eight Circuit acknowledged, but did not
address the merits of, the argument that the statute of limitations was tolled by the arrest order issued by the
demanding nation.

processes of the systems of Switzerland and the United States is commonly required in treaty interpretation," and finding a Swiss warrant served as the functional equivalent of an indictment based on its form, contents, purpose, and the role of the issuing official). In short, at the extradition stage, the court looks to the charging document to determine if it is sufficient to initiate a criminal proceeding.

### b. The 1993 Bosnian Criminal Report Tolls the Statue of Limitations

District Prosecutor Izudin Berberović stated in his affidavit dated October 17, 2012 that the Criminal Report "functions to initiate beginning of a criminal prosecution under the law of Bosnia and Herzegovina and the law of the Republika Srpska and is sufficient to toll any statute of limitations under Bosnian or Republika Srpska law." Berberović Aff. 1 (Dkt. No. 39-1). Thus, this is not a case where the court is relying solely on the statement of the (United States) Government. Cf. In re Extradition of Tawakkal, CRIM. 3:08MJ118, 2008 WL 3895578, at *7 (E.D. Va. Aug. 22, 2008) (finding that the Government's statement, without further explanation, was insufficient grounds for a finding that a foreign document was the equivalent to a United States charging document for tolling purposes). Courts have relied on the statements of foreign prosecuting officials to determine if a step taken in that foreign legal system has tolled the statute of limitations. See Skaftouros, 667 F.3d at 161-2 (holding that the extraditee had not met his burden of proving that the applicable Greek statute of limitations had expired where the Greek Government had submitted a letter from the Public Prosecutor of the Court of Appeals of Athens stating that the statute of limitations had been tolled, even in the face of a contrary claim from the extraditee's Greek counsel); cf. In the Matter of the Extradition of Murphy, No. 98-M-168, 1998 WL 1179109, at *4 (N.D.N.Y. June 30, 1998) (finding that charges were validly stated

under Canadian law based on the affidavit of a Canadian prosecutor and noting that it is not an extraditing court's function to analyze foreign law).

Prosecutor Berberović stated in his affidavit that both during and after the war "the territory of the current Republika Srpska was a constitutive part of the then Republic of Bosnia and Herzegovina and the current Bosnia and Herzegovina" and that "[b]oth Republika Srpska and Bosnia and Herzegovina view the 1993 criminal report as valid and binding today." Berberović Aff. 2 (Dkt. No. 39-1). Nezirovic has not put forward any evidence to refute District Prosecutor Berberović's interpretation of Bosnian law. The burden does not rest on the Government to prove that the statute of limitation has not run, rather it rests on Nezirovic to prove that it has or to otherwise show that the so-called charging document does not have the tolling effect claimed by the government. Skaftouros, 667 F.3d at 161 (holding that the District Court improperly placed the burden on the Government to prove the statute of limitations had not run, rather than on the extraditee to prove that it had).

It would be a grave insult for this court to presume to tell the Government of Bosnia and Herzegovina what is or is not legitimate under Bosnian law. Declaring to a foreign sovereign that what it states to be valid under its own laws is in fact invalid would not be in keeping with the heightened principles of judicial modesty at play in an extradition proceeding. See Skaftouros, 667 F.3d at 156. "Any arguments regarding the demanding country's compliance with its own laws [] are properly reserved for the courts of that country." Id. (citing Fernandez v. Phillips, 268 U.S. 311, 312 (1925)). Nezirovic's legal defenses to these charges must ultimately be addressed in the same place his factual defenses will properly be raised: the courts of Bosnia.

Finally, this court remains mindful of the limited role it plays in what is, ultimately, an exercise of the Executive's foreign affairs powers. See Ordinola v. Hackman, 478 F.3d 588, 606

(4th Cir. 2007) ("Because extradition is a creature of treaty, the power to extradite derives from the President's power to conduct foreign affairs. Extradition, therefore, is an executive function rather than a judicial one." (internal citations omitted)); see also In re Extradition of Fulgencio Garcia, 188 F. Supp. 2d 921, 927-28 (N.D. Ill. 2002) ("[I]n the context of extradition, [courts] must move with the circumspection appropriate when a court is adjudicating issues inevitably entangled in the conduct of our international relations." (quoting In re Burt, 737 F.2d 1477, 1487 (7th Cir.1984))). Finding the Criminal Report to be invalid based on the political and legal standing of Republika Srpska in 1993 as suggested by Nezirovic would require this court to make determinations which are decidedly within the purview of the Executive. In light of these considerations and based on the representations of the Bosnian Government the court finds that the 1993 Charging Document would toll any applicable statute of limitations.

The Basic court analyzed the exact charging document at issue and found that same 1993 Criminal Report tolled the running of the statue of limitations for capital offenses. In re Extradition of Azra Basic, 5:11-MJ-5002-REW, 2012 WL 3067466, at *15 (E.D. Ky. July 27, 2012). [5] The Court accepted Bosnia's proclamation of its own procedures as accurate. Id. (citing In re Extradition of Gang–Choon Han, No. CV 11–2059–DMG, 2012 WL 33201, at *12 (C.D. Cal. Jan. 6, 2012) (accepting the representations of a Korean prosecutor as to the Korean charging process and the effect of particular document form)). The Basic court found the Criminal Report "sufficiently equivalent to an indictment or information, for tolling purposes, under federal law" and noted that it would not "question what [Bosnia] avers about its own system." Id. at *16 (comparing the Criminal Report to the warrant at issue in Sainez v.

---

[5] The Basic court used the term "Criminal Charge" as opposed to "Criminal Report." Prosecutor Berberović explained in his affidavit that the "English expressions criminal charge and criminal report are used as synonyms and interchangeably for Bosnian translation of the expression criminal report in the sense of the Criminal Procedure Code, and they have identical meaning." Berberović Aff. 2 (Dkt. No. 39-1).

Venables, 588 F.3d 713 (9th Cir. 2009)). The court further found that "even under United States foundational principles" the Criminal Report contained "sufficient indicia to qualify as valid in the tolling context." Id.[6] Presented with the same document, this court reaches the same conclusion as the court in Basic – that the Criminal Report effectively tolls any statute of limitation under Bosnia law and therefore has the same effect to the applicable United States statute of limitations for the purpose of extradition.[7]

By finding that the 1993 Criminal Report tolls the running of the statute of limitations, I further find that no limitation period has run regardless of whether calculated under the eight year period of the Torture Act or the general five year period for non-capital federal crimes.

## C. Political Exception

### 1. Extradition Cannot Be Granted For A Political Offense

Nezirovic also argues that his alleged war crimes were political offenses, and are consequently exempt from extradition. Article VI of the Extradition Treaty provides that "[a] fugitive criminal shall not be surrendered if the offense in respect of which his surrender is demanded be of a political character." This type of provision is known generally as the "political offense exception," which forbids countries from extraditing people who are accused of offenses that are "political" in nature. Ordinola, 478 F.3d at 595.

In Ordinola, the Fourth Circuit identified two categories of political offenses: "pure" political offenses, which are crimes perpetrated directly against the state and do not intend to cause private injury, such as treason, sedition and espionage; and "relative" political offenses, or

---

[6] Specifically, the Basic court found the Criminal Report sufficiently specific to qualify as a charge initiation for tolling purposes as it identified an individual by first name, indicated last name unknown, gave a gender (female), a rank ("commander"), and an associated military unit from a particular town. Id. at *16 (comparing Fed. R. Crim. P. 7(c)(1)'s requirement that an indictment or information provide sufficient particularity).

[7] Each of Nezirovic's alleged victims named in the 1993 Criminal Report are likewise named in the documentation submitted in support of Bosnia's extradition request. Thus, as in Basic, the charge of committing "War Crimes against Civilians" is tolled by the 1993 Criminal Report as to each identified victim.

common crimes that are so intertwined with a political act that the offense itself becomes a political one.  Id. at 596.  The Fourth Circuit further adopted the "incidence test" to determine whether a "relative" political offense is sufficiently political to fall within the exception.  The incidence test asks whether: 1) there was a violent political disturbance or uprising in the requesting country at the time of the alleged offense; and if so, 2) whether the alleged offense was incidental to or in the furtherance of the uprising.  Id. at 597.  Nezirovic bears the burden of proof to establish the essential elements of the political offense exception.  Arambasic v. Ashcroft, 403 F. Supp. 2d 951, 957 (D.S.D. 2005).  If Nezirovic establishes those elements, the burden shifts to the demanding government to prove that the crimes charged in the complaint were not of a political character.  Id.

There is no question that Nezirovic's alleged actions occurred during the course of a violent political uprising. This court takes judicial notice of the conflict in Bosnia between March of 1992 and December of 1995, when the Dayton Peace Accord was signed.  See Arambasic, 403 F. Supp. 2d at 958 ("this Court may properly take judicial notice of a political disturbance in an extradition case.").  Additionally, Nezirovic presented evidence at the evidentiary hearing from Carl Dahlman, Ph.D., regarding the organized military action in Bosnia between the Bosnian Serbs, Croats and Bosniaks, which involved mass killing, expulsion, deportation, rape, and torture.  (Tr., pp. 42-58). Thus, the extradition record supports the determination that there was a violent political disturbance or uprising in Bosnia at the time of Nezirovic's alleged actions.

The court must next determine whether the acts charged against Nezirovic were recognizably incidental to the political disturbance.  Arambasic, 403 F. Supp. 2d at 958.  The court must consider this issue both subjectively and objectively; that is, Nezirovic must show not

only that the alleged offenses were subjectively politically motivated, but also that they were objectively political. "[A] political motivation does not turn every illegal action into a political offense." Ordinola, 478 F.3d at 600. "[T]he heart of the inquiry when it comes to determining whether the charged offense falls within the political offense exception must be objective." Ordinola, 478 F.3d at 613. (Traxler, J., concurring.)

## 2. Nezirovic's Alleged Conduct Was Not Subjectively Political

Nezirovic presented evidence that his decision to join the HVO and to serve as a guard at the Rabic camp were subjectively politically motivated. At the time that Nezirovic joined the HVO in 1992, his hometown of Derventa was under attack by Bosnian Serbs. Nezirovic described lying with his family in his living room listening to grenades and shooting on the first day of the war. He described watching his friend and others die from sniper fire. (Tr., pp. 125-26.) He testified that he joined "any army which can defend me and my family; it doesn't matter who and what, you know." (Tr., p. 122.) He further stated that he didn't have "any other option for defend yourself [sic]." Id. After Nezirovic joined the HVO, he worked as a guard at the Rabic camp, where his job was to keep the prisoners "locked up." (Tr., p. 124.) Nezirovic claims that he believed the prisoners housed at the camp were soldiers who had attacked Derventa. (Tr., p. 124.) Nezirovic is charged with torturing those prisoners; specifically, beating them with his arms, legs, rifle, batons and other objects, starving them, forcing them to eat grass on which the guards had urinated, forcing them to sniff other prisoners' anuses, and forcing them to expose three specific fingers used both in the Chetnik salute and in Orthodox prayer, and striking those fingers with a rubber baton or stick. Gov'ts Memo. in Supp. of Extradition, Ex. C. (Dkt. No. 18-4).

This court accepts Nezirovic's claim that his decision to join the HVO was subjectively motivated by his fear and desire to defend his family, home and town. Nezirovic had not actively participated in the political and ethnic events which lead to the civil war in Bosnia. In fact, Nezirovic testified that although his ethic background is Muslim, he married a woman who is half Serbian and half Croatian. Nezirovic noted that the Bosnia he grew up in "didn't care about that." The war caused Nezirovic to choose sides, and he choose to fight with the HVO, the local militia because it was the only option to defend himself and his family. Nezirovic did not enlist in the army for any deep-rooted political reason; he enlisted to protect his family and homeland.

### 3. Nezirovic's Alleged Conduct Was Not Objectively Political

The court further does not find that Nezirovic's alleged actions were objectively incidental to or in furtherance of the political disturbance in Bosnia. In determining whether Nezirovic's alleged acts were objectively political, the court considers the totality of the circumstances, including the mode of the attack and the identity of the victims. See Ordinola, 478 F.3d at 601.

Nezirovic claims that these alleged acts were "political" because he committed them in the course of performing his military duties during a violent political uprising. However, the fact that Nezirovic was in an organized military unit during a political disturbance does not mean that every act he committed is covered by the political offense exception. Arambasic, 403 F. Supp. 2d at 959. The Extradition Treaty "cannot be read to protect every act-no matter how unjustifiable and no matter the victim-simply because the suspect can proffer a political rationale for the action." Ordinola, 478 F.3d at 600.

The objective evidence in this case establishes that Nezirovic's alleged victims were civilians. See Dist. Prosecutor's Decl. in Support of Extradition at 1, 9-10. Even if the prisoners at the Rabic camp were unarmed soldiers, as Nezirovic claims, pursuant to the Geneva Convention relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 ("Geneva Convention (IV)"), to which the United States and Bosnia were signatories in 1992, "members of armed forces who have laid down their arms and those placed hors de combat by….detention, or any other cause, shall in all circumstances be treated humanely." 1949 Geneva Convention (IV), Art. 3(1).

In Ordinola, the Fourth Circuit explicitly held that the civilian status of victims is relevant to the political exception analysis, noting that the State Department adheres to the view that the political offense exception is not applicable to violent attacks on civilians. Ordinola, 478 F.3d at 603. Courts have repeatedly held that there can be no justifiable connection between attacks against civilians and a political disturbance or uprising. See Arambasic, 403 F. Supp. 2d at 963 (attack on policemen who were unarmed and had surrendered and other unarmed civilians does not fall within the political offense exception); In the Matter of the Requested Extradition of Suarez-Mason, 694 F. Supp. 676, 707 (N.D. Cal. 1988)(rejecting the political offense exception where the victims were in custody at the time of the charged offenses and were "not a military threat."); In the Matter of the Extradition of Marzook, 924 F. Supp. 565, 577-578 (S.D.N.Y. 1996)("attacks targeted at civilians do not advance any political motive other than as terrorist acts.") Matter of Extradition of Demjanjuk, 612 F. Supp. 544, 570 (N.D. Ohio 1985)("The civilian status of the victims is also significant because the United States does not regard the indiscriminate use of violence against civilians as a political offense.") (citing Ornelas v. Ruiz, 161 U.S. 502, 511, 16 S. Ct. 689, 692, 40 L. Ed. 787 (1896); Eain v. Wilkes, 641 F.2d 504, 516,

528 (7th Cir. 1981)))  As the court in <u>Arambasic</u> stated, "[p]olitical strife is not a license for the military or anyone else to do whatever they wish to the defenseless that have come under their power."  403 F. Supp. 2d at 963.

Nor is there evidence that Nezirovic's alleged actions of torture against the prisoners was in furtherance of his military duty to keep them "locked up."  (Tr., p. 124.)  Nezirovic's alleged conduct of beating, degrading and humiliating prisoners went well beyond his duties to guard the prisoners. Thus, regardless of the prisoners' civilian status, Nezirovic failed to establish an objective connection between his alleged actions at the Rabic camp and a political purpose.

**4.  Nezirovic's Alleged Conduct is Not Excused by Other Atrocities**

The court also rejects Nezirovic's argument that his actions should be excused because they were not "disproportional" to the violence, destruction, and death that the Chetnik military and paramilitary forces inflicted during the war.  Nezirovic contends that the vast majorities of atrocities committed during the breakup of the former Yugoslavia were committed by the Chetnik forces against whom he was fighting.  Dr. Dahlman testified to this fact during the evidentiary hearing.  The fact that some Serbs committed horrific crimes against Bosniaks, Croats, and other Serbs does not in any way justify or excuse the torture or inhuman treatment of Serbian civilians or prisoners.   Likewise, the fact that the conflict in Bosnia was a brutal war does not justify or excuse the brutal actions alleged to have been committed against civilians. Nezirovic's suggestion that the torture of civilians is somehow justified by the general cruelty of ongoing war is contrary to basic provisions of international law, which prohibit such crimes against humanity.

Nezirovic did not meet his burden to prove that his actions were incidental to or in furtherance of the violent political uprising in Bosnia, and consequently, he is not exempt from extradition under the political offense exception in the Extradition Treaty.

### D.  Motive of Bosnian Government

Nezirovic also argues that he should not be extradited because Bosnia seeks to punish him for a political offense.  This court may not delve into the political motivation of the prosecution in Bosnia.  Rather, that is a question properly addressed solely to the Secretary of State.  See Ordinola, 478 F.3d at 605; Matter of Extradition of Marzook, 924 F. Supp. at 578; Eain v. Wilkes, 641 F.2d at 516 ("evaluations of the motivation behind a request for extradition so clearly implicate the conduct of this country's foreign relations as to be a matter better left to the Executive's discretion"), cert. denied, 454 U.S. 894, 102 S. Ct. 390, 70 L. Ed.2d 208 (1981); In re Extradition of Tawakkal, CRIM. 3:08MJ118, 2008 WL 3895578 (E.D. Va. Aug. 22, 2008)("[t]he so-called rule of judicial non-inquiry leaves political determinations to the Secretary of State: 'It is the duty of the judicial branch to ensure that the individual sought is subject to extradition, while it is the duty of the executive branch, which possesses great power in the realm of foreign affairs, to ensure that extradition is not sought for political reasons and that no individual will be subject to torture if extradited.')(citing Hoxha v. Levi, 371 F. Supp. 2d 651, 660 (E.D. Pa. 2005)).

## II.    CONCLUSION

For the reasons stated above, and pursuant to 18 U.S.C. §3184 and the Extradition Treaty between the United States and Bosnia signed at Belgrade October 25, 1901 and entered into force June 12, 1902, the court **CERTIFIES** the extradition of Almaz Nezirovic on the offenses of War Crimes against Civilians that occurred from April through June 1992.

It is **ORDERED** that Almaz Nezirovic shall remain committed to the custody of the United States Marshal pending further decision on extradition and surrender by the Secretary of State pursuant to 18 U.S.C. §3186.

It is further **ORDERED** that the Clerk of this Court forward a certified copy of this Certificate of Extraditability, together with all formal extradition documents received into evidence, a certified copy of all testimony and evidence taken at hearings and all memoranda of law filed on the issue of extradition, and all orders of court, to the Secretary of State.

Enter: September 16, 2013

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge