IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

ROANOKE DIVISION

| | |
|---|---|
| In Re: In the Matter of<br><br>Extradition of Almaz Nezirovic | 7:12-mc-00039 |

PROCEEDINGS HELD BEFORE

THE HONORABLE ROBERT S. BALLOU, JUDGE

November 19, 2012
10:10 a.m. to 11:30 a.m.
Lynchburg, Virginia
Pretrial Motions Hearing
Interpreter:  Emese Purger Kedmen

Appearances:

        United States Attorneys Office
        310 First Street, SW, Room 906
        Roanoke, Virginia  24008
        BY:  Timothy J. Heaphy, USA
             Elizabeth G. Wright, AUSA
        (540)-857-2250

        Federal Public Defenders Office
        210 First Street, SW, Suite 420
        Roanoke, Virginia  24011
        BY:  Fay Frances Spence, Esq.
        540-777-0880

REPORTED BY:                    JANELLE A. MUNDY
                                PO Box 8206
                                Roanoke, VA 24014
                                (540) 342-2547

1   (November 19, 2012, 10:10 a.m.)

2

3                    P R O C E E D I N G S

4

5            THE COURT:  I want to thank you, first of

6   all, for relocating over here for this morning when we

7   had some facility difficulties.  Let's go ahead and call

8   the case.

9            MS. CLERK:   In re:  The Matter of

10  Extradition of Almaz Nezirovic, miscellaneous number

11  7:12-mc-39.

12           THE COURT:  All right.  The record reflects

13  the Government is present with its counsel.  Mr.

14  Nezirovic is also present with his counsel.  Madam

15  Interpreter, have you been sworn?

16           MS. INTERPRETER:  Yes, sir.

17           THE COURT:  Very well.  I have on our

18  calendar for oral argument today on -- we have all the

19  evidence in.  I read the transcript and all of your

20  briefs.  So we'll hear any argument the Government has

21  to offer.  Mr. Heaphy.

22           MR. HEAPHY:  Thank you, Your Honor, and good

23  morning again.  We are here for final argument on the

24  extradition petition.  I will not spend much time going

25  through the procedural rules that govern the hearing.

```
 1   We carefully briefed that.  I don't think there is a lot
 2   of dispute.  Honestly, Your Honor, this is part of a
 3   larger conduct of foreign affairs, and our role as the
 4   United States attorney is limited, as is the Court's
 5   role.  It's really a limited inquiry to make certain
 6   findings whether there is a valid treaty, whether this
 7   is the person wanted by the foreign government and
 8   whether there's probable cause that we accept the
 9   information presented by the Bosnians as correct.  The
10   rulings are liberally construed to facilitate the
11   request of the foreign government.  Constitutional
12   rights, obviously, do not apply.
13          THE COURT:  I think we get down to really
14   there is just a couple of issues.  I mean, while I'm not
15   going to take any defenses away from Mr. Nezirovic, the
16   treaty is not at issue, Mr. Nezirovic's identity is not
17   at issue, whether he is the right person, whether there
18   is probable cause, it's really a statute of limitations
19   question.  Maybe somewhat of an ex post facto issue and
20   political offense exception are the primary things I see
21   out there.
22          MR. HEAPHY:  Your Honor, I think that's
23   exactly right.  The Court has to make six separate
24   findings.  I think really only one of them, and that's
25   the crimes covered by the treaty, is at stake.  We don't
```

1    have an issue here of authority (unintelligible)

2    judicial office of the proceeding, jurisdiction over

3    fugitive is established as to his identity, the treaty

4    being in full force and effect, even the probable cause.

5    I think it really comes down to that final requirement;

6    which is, whether or not the crimes that for which the

7    extradition is sought is covered by the treaty.

8                    THE COURT:  Right.

9                    MR. HEAPHY:  So let me, Your Honor, I will

10   skip any preliminaries and go straight to those two

11   issues.

12                   The first that you mentioned was the statute

13   of limitations.  The treaty in Article 7 provides an

14   extradition shall not be granted if, legal proceedings

15   or the enforcement of the penalty for the act committed

16   by the person claimed has become barred by limitation,

17   according to the laws of the country to which

18   requisition is addressed.

19                   That means United States law applies when

20   determined whether or not there has been a statute of

21   limitations violation.  The courts that have interpreted

22   that, Your Honor, have looked to the most closely

23   analogous statute under United States law.  Here we

24   submit that that's 18 USC 2340A.  That's the torture

25   statute, which is closest to the definition of torture

```
 1   in the convention in which torture governs the law here.
 2              THE COURT:  Now, the Kentucky Court -- I
 3   read the Kentucky Court's decision.  That magistrate
 4   judge disagreed.
 5              MR. HEAPHY:  Exactly.
 6              THE COURT:  And I forget exactly what did
 7   the Oregon Court do, which would seem to be the two most
 8   closely analogous cases to what we have here.
 9              MR. HEAPHY:  I don't believe the Oregon
10   Court faced that precise issue.  But the Basic Court
11   did, Your Honor, exactly.  Our position on Basic, on
12   that narrow of question, is that the Court essentially
13   got it wrong.  The Court implied ex post facto right to
14   the fugitive really should not apply.  That's because
15   they misinterpreted it -- in our view, the magistrate
16   judge misinterpreted this same treaty as a dual
17   criminality treaty.  And Ms. Spence in her brief makes
18   the same assumption and argues that Article 1 of the
19   treaty makes this essentially a dual criminality treaty.
20   The same act must be criminal in both jurisdictions.
21              Looking closely at the plain language of the
22   treaty, which is where we submit the Court should start.
23   We think that's a faulty reading because from Article 1
24   of that treaty, explicitly refers to the crimes
25   enumerated in Article 2.
```

```
 1                  To read you the actual language:  The
 2      Government of the United States and the Government of
 3      Servia mutually agree to deliver up persons who, having
 4      been charged with or convicted of any crimes and
 5      offenses specified in the following article, committed
 6      within the jurisdiction of one of the high contracting
 7      parties, shall seek an asylum of be found within the
 8      territories of other:  Provided, that this shall only be
 9      done upon such evidence of criminality as, according to
10      the laws of the place where the fugitive or person so
11      charged shall be found, would justify his or her
12      apprehension and commitment for trial if the crime or
13      offense had been committed there.
14                  In our view, Your Honor, that essentially is
15      saying that that is an evidentiary basis.  That you have
16      to apply the same evidentiary standards to the crimes
17      you enumerated in Article 2.  It's not a broad view of
18      criminality provision that exists in other treaties.  A
19      crime has to be the same in the contracting parties.  It
20      limits the consideration of that probable cause
21      standard.  That's the standard that we apply here to the
22      crimes enumerated in Article 2.
23                  I don't believe the Basic Court
24      (unintelligible).  Article 1 does not broaden this to
25      anything that's a crime in both countries.  Can it be
```

1  the crime for which extradition?  Not at all.  It limits

2  the crimes for which extradition is available to certain

3  enumerated crimes in Article 2.  And Article 1 simply

4  says you have to apply whatever the standard is in that

5  country, the evidentiary standard, and that's here

6  probable cause.

7          THE COURT:  Tell me, again, exactly what I'm

8  supposed to take out of the language that says that

9  extradition is to take place for participation in any of

10  the crimes and offenses mentioned in the treaty.  And we

11  know that the convention against torture ends up being

12  part of the treaty now.

13          MR. HEAPHY:  Exactly.

14          THE COURT:  Right.  Provided that the

15  participation may be punished in the United States as

16  felony and in Serbia as a crime.  The way I read the

17  Basic Court is it said that in 1993 or 1992 torture

18  could not be punished in the United States as a crime

19  because of the ex post facto law.  And that's in hence

20  the reason why the Basic Court then relies so heavily on

21  the 1993 document that may or may not be a charging

22  document, depending upon your view of it.

23          MR. HEAPHY:  Exactly, Your Honor, that's

24  what the Basic Court did.  The Basic Court essentially

25  said you have to have been able to bring this case, this

1    hypothetical case, in the United States in 1992, 1993.

2    Couldn't do that with the torture statute because it

3    hadn't been enacted.  That reads an ex post facto right

4    into the treaty, which in our view, is contrary to clear

5    weight of authority repeating the ex post facto and

6    other constitutional protections don't apply.  It

7    misreads Article 1.

8              Again, our suggested reading of the treaty

9    is that Article 1 said:  For these crimes, these new

10   crimes in Article 2, you have to find that -- you have

11   to apply essentially the American evidentiary standard,

12   the probable cause.  But, again, it only refers to

13   crimes that are listed.  The torture convention, which

14   was enacted also after the fact, was grafted onto it.

15             So all we are doing, Your Honor, is we're

16   taking a newly defined crime, it was always criminal

17   under American law, first of all, the allegations here

18   would have violated many different American statutes.

19   But we are taking now a newly grafted listed crime,

20   according Article 2, the torture, and applying an

21   American evidentiary standard, probable cause.  You

22   can't, I would submit, according to the well settled

23   principle that ex post facto -- we are not going back

24   hypothetically to whether a prosecution could have been

25   broad enough.  That's an improper standard under the

1       plain reading of Article 1 and 2.

2               So we just think the <u>Basic</u> Court with

3       respect to that hypothetical American prosecution, that

4       would have started in 1992, is just a wrong standard.

5       All the court should have done was say is there a listed

6       offense under Article 2.  And then Article 1 says apply

7       probable cause standard to that.  And the court looking

8       for probable cause for torture clearly find, on that

9       record, that there was and not apply ex post facto

10      protection.  That's what we submit.

11              As our first argument, the Court should

12      essentially follow <u>Oppenheim</u> and <u>Hilario</u>.  <u>Oppenheim</u> is

13      exactly on point.  That is a case in which the original

14      offense by the fugitive, Mr. Oppenheim, did not exist.

15      It was later codified under American law as a bankruptcy

16      fraud.  And the court found him extraditable because ex

17      post facto doesn't apply.  As long as it is a crime at

18      the time of the extradition clause, not at the time of

19      the original commission of the offense, then it's proper

20      under the treaty.

21              We submit the very same rule should apply

22      here.  Do we have now at the time of the request a crime

23      that's listed under the treaty?  Do we have probable

24      cause of that offense?  That's really all the Court has

25      to find.  And that does not allow an (unintelligible) of

1   ex post facto or any other constitutional right.  That

2   would be inconsistent with the law, Your Honor.

3            THE COURT:  So it's the Government's

4   viewpoint is you apply solely the statute of limitations

5   analysis under the torture statute.

6            MR. HEAPHY:  The currently existing law at

7   the time of the extradition request, which today is

8   2340A, which has no statute with no serious bodily

9   injury.  So here there is no statute and the Court

10  really should certify this that probable cause of

11  torture without regard to statute of limitations

12  because, one, does not apply under current American law.

13  To go back to this hypothetical prosecution is a

14  misreading of the treaty.  And, Your Honor, I won't go

15  over all the cases again.  We have cited the Oppenheim

16  case is the one that is most closely analogous.  The

17  Hilario case was another case involving a change in law,

18  statutory law.  Ms. Spence has argued that ex post facto

19  doesn't apply to interpretations of treaties or new

20  treaties.

21           THE COURT:  A procedural-type thing.

22           MR. HEAPHY:  Exactly.  Our view, Your Honor,

23  is that any type of statute that postdates the

24  commission is similar, is not something that triggers

25  the ex post facto.  Now, Basic went on obviously to find

1    that the very same document that we have at issue here

2    tolls the statute of limitation.  Importantly, it was

3    exactly the same document.  It was a document that was

4    filed in January of '93 that made allegations against, I

5    believe, 126 individuals including Ms. Basic and Mr.

6    Nezirovic.

7              THE COURT:  If I followed Basic, and looking

8    at that document it indicates -- and this is where I

9    need some help in understanding the Bosnian section 142,

10   which I believe is the war crimes section.  But it

11   indicates, it only lists 6 or 7 people that are

12   specifically identified as having been the victims of

13   the alleged conduct of Mr. Nezirovic.  If I follow

14   Basic, is the war crimes statute broad enough to allow

15   extradition as to all of the individuals that are set

16   out in the Government's extradition document, which I

17   think is about 25 individuals, from whom statements were

18   taken that identified Mr. Nezirovic as having

19   participated in some type of alleged brutality in

20   prison?

21             MR. HEAPHY:  Your Honor, I would submit

22   that's a question of Bosnian law for the Bosnians to

23   sort out.  The charging document for violation of

24   section 142, I think it is, under Bosnian law does not

25   specify victims.  It simply talks about war crimes

1    committed against civilians.  That's the precise statute

2    or charge which we are submitting that the Court should

3    certify.  You're right, the Basic Court did parse out

4    certain individual victims who were listed in the 1993

5    document and separated that from those who were not.

6              Our view, again, that is really a question

7    to be resolved in Bosnia because all of the

8    certification requests is for violation of 142 for

9    torture of civilians period.  They then will parse out

10   whether or not certain victims are -- he hasn't even

11   been indicted under the Bosnian system and can't be

12   indicted until he's present.  So I presume there will be

13   some more detailed accounting or charging document which

14   lists with more particularity who the victims are but

15   that's premature.  He is simply charged with war crimes

16   against civilians and that's what we request the Court

17   certify.

18             Now the '93 document, Your Honor, tolls the

19   statute of limitations.  The Basic Court found that.  It

20   was sufficient with particularity that lists the victims

21   it actually had attached to it.  The statements that

22   were gathered from those victims.  It identifies them by

23   name.  In contrast to Ms. Basic, whose first or last

24   name I believe wasn't listed, Mr. Nezirovic's both names

25   are listed.  It's very clearly him.  We also have an

1    affidavit from the Bosnian prosecutor, again,

2    authoritative document from an official, legal official

3    in Bosnia, who finds that is an initial document in any

4    Bosnian criminal case, it constitutes a procedural

5    action which interrupted the course of limitations of

6    criminal prosecution.  It says if there was a statute it

7    would have been tolled in Bosnia by that doctrine.

8            We submit that's an authoritative

9    interpretation of the validity of the 1992 doctrine.

10   And the Court, again, presuming that the Bosnians know

11   their law, presuming that we interpret those documents

12   favorably, that anything close favors the extradition.

13   That clearly establishes that that document tolls that

14   statute of limitations.

15           Even if we didn't have that, Your Honor,

16   that affidavit is just the functional equivalent of an

17   American Information.  It does specify identity

18   particularly the area of timeframe allegation.  It

19   includes the information that would be in a criminal

20   indictment.  And significantly, Your Honor, that '93

21   document kicked off a series of proceedings in Bosnia

22   demonstrating its validity.  Most importantly, the

23   document that was filed in 1993 was later reviewed by

24   this International War Crimes Tribunal, which

25   essentially blessed it and passed it along to the

1    Bosnian government for pursuit.  That was part of the

2    '95 Dayton Peace Accords.

3              So to the extent there is some question as

4    to its legitimacy, the Internation Tribunal confirmed it

5    by saying it is a valid document which can be pursued by

6    the Bosnian government.

7              THE COURT:  But the arrest warrant and the

8    other charging document, do they refer back to this 1993

9    document to where it's clear that it is an extension of

10   what was begun in January of '93?

11             MR. HEAPHY:  Your Honor, I don't believe

12   that the 2003 document for which we only have a

13   translation specifically references the 1993 document.

14   It does not say pursuant to the act of January 1993, no.

15   But, again, our job is not to look beyond the plain

16   interpretation of the Bosnian prosecutor and the plain

17   language of the documents and try to impose an American

18   veneer of procedural fairness.  We have a very different

19   system that exists in the Bosnia civil law system and an

20   opinion by the Bosnian prosecutor.  But that document

21   issued by a legitimate government is valid and kicked

22   off the process which is still ongoing, if there is

23   certification, which will ultimately result in a further

24   charge and indictment and a proceeding in adjudication

25   of Mr. Nezirovic.

1          So, Your Honor, in terms of Basic, again to

2    summarize, we think that the court wrongly brought this

3    back to a hypothetical prosecution in American courts

4    from 1992.  We think the Court should essentially comply

5    to 2340A.  That would be much more consistent with the

6    overwhelming authority that ex post facto doesn't apply

7    in extradition.  In list treaty cases, which this is,

8    not a dual criminality treaty case (unintelligible).

9    Even if the Court does apply the Basic logic and find

10   that the statute of limitations does apply, the '93

11   document tolls that and that further justifies it.

12          THE COURT:  Even if it's a dual criminality

13   treaty, it doesn't change the way in which the

14   Government looks at it.  Ex post facto still doesn't

15   apply.  The convention against torture gets incorporated

16   in.

17          MR. HEAPHY:  Exactly.  I am simply reacting

18   to Ms. Spence's argument or the Basic Court in trying

19   to, sort of, rebut the presumptions that underlie their

20   position.  But you're exactly right, whatever kind of

21   treaty this is, we think Oppenheim, Hilario and the

22   other cases make clear that ex post facto is not

23   available.  That you apply the law and enforce at the

24   time of the request and not at the time of the alleged

25   criminal conduct.  That's what we ask the Court to do

1    here.  Anything else on statute of limitations?

2            THE COURT:  No, that covers it.

3            MR. HEAPHY:  Well, I'll go on quickly to the

4    political offense issue in the other way which Ms.

5    Spence argues that this is not a crime covered by the

6    treaty.  That it's a political offense.  The standard

7    for that is articulated in the Fourth Circuit in the

8    Ordinola case.  It classified two things.  The presence

9    of a violent political disturbance; and two, whether the

10   alleged offense was incidental to or in furtherance of

11   the uprising.

12           Here, Your Honor, we have the presence of a

13   violent political disturbance.  But we do have serious

14   beliefs highly that the alleged offense was nowhere

15   close to the incident to or in furtherance of the

16   uprising.  The policy here is to protect people who just

17   fought back against their government to secure political

18   change.  Not a shield for common criminals whose crimes

19   occurred during a time of political disorder.

20           That's straight from Fourth Circuit in

21   Ordinola.  What we have here is not someone who is

22   justly fighting back against government but rather a

23   common criminal who used the political context to

24   persecute and degrade and inhumanly treat civilians.  In

25   Ordinola the fugitive is a member of a military unit who

 1   sought extradition for his offenses of homicide,

 2   kidnaping, forced disappearance.  The court rejected the

 3   political offense exception focusing on mode of

 4   commission of the offenses and the nature of the

 5   victims.

 6          Here both of those factors, motive, attack

 7   and identity of the victims, defeat any political

 8   offense claim.  Let's first talk about the victims, Your

 9   Honor.  The material received from Bosnia, again make

10   clear, these were unarmed civilians.  These were not

11   offenses committed on a battlefield.  They were rather

12   done in a prison setting with defenseless individuals.

13   Who, according to the Bosnians, were civilians and not

14   combatants of any sort.

15          THE COURT:  Does it matter?  I understand

16   one of the arguments and this is more made at the

17   evidentiary hearing, is that almost all the combatants

18   during this civil war were civilians in many respects.

19   Both came out of their ordinary lives and thrown into

20   this conflict to protect themselves and families and so

21   forth.  So it became a true civil war.  So all of the

22   combatants were civilians at heart.  So everyone that

23   winds up in the prisons are civilians.

24          MR. HEAPHY:  If Mr. Nezirovic had done this

25   to uniformed military personnel, who had been captured

1     on the battlefield, this would still be torture.

2             Whether or not they were or were not at some

3     point engaged in combat, doesn't matter.  The point is,

4     at the time of the commission of these offenses they

5     were not combatants.  They were prisoners.  They were

6     unarmed.  They were not engaged in any fighting.  They

7     were simply being held in a prison facility.

8             Regardless of the fact that it's a civil war

9     and it's messy and there was a lot of terrible things

10    that went on, on both sides, the fact remains at the

11    time of these offenses they were civilians.  And the

12    Bosnian affidavit establishes that.  Again, we have to

13    take that as established.  These were civilians.  So the

14    identity of the victims here, Your Honor, removes this

15    from the realm of the political offense.  The Department

16    of State has made clear torture of unarmed civilians can

17    never be a political offense.  It's always against

18    International law.  The defense's own expert confirmed

19    that torture against prisoners in International law

20    cannot be justified by some sort of political gain.

21             The other thing that's significant here,

22    Your Honor, is pay close attention to what Mr.

23    Nezirovic said.  He did not claim any sort of political

24    motivation.  When he testified, he actually told this

25    Court that he joined the HVO to protect his family and

```
1   that his job at the Rabic camp was to keep people locked
2   up; far from describing some sort of larger goal of
3   protecting his way of life or government.  He simply
4   says that he was there to protect his family.  A very
5   personal motivation.  Not a political motivation where
6   he was engaged in some larger struggle to protect the
7   integrity of the formal government.  His own testimony
8   was it was a personal desire to protect his family.  And
9   the only way he believed he could do that, according to
10  him, was to join this military unit.  So his own
11  testimony takes it out of the realm of the political.
12          Then finally, the mode of attack is the
13  other facture cited by the Ordinola Court.  The mode of
14  attack here, Your Honor, was torture, degrading
15  treatment, forcing people to strip naked and put
16  anal/nasal contact, urinating on the ground and forcing
17  prisoners to graze on that grass.  That mode of attack
18  far from holding prisoners so they would be isolated
19  from the battlefield, he is not being prosecuted for
20  that.  He is being prosecuted in Bosnia for the
21  degrading torture.
22          We heard testimony of the three-finger
23  salute or three-finger sign that the Serbs used as a
24  Nationalistic and religious significance.  The evidence
25  is that Mr. Nezirovic would have the prisoners put their
```

1    fingers on a table and beat it repeatedly.  That

2    demonstrates an ethnic bias far from simply neutralizing

3    people from the battlefield but persecuting them in a

4    way due to their ethnicity, national position and their

5    religion.  Those are the allegations that we have here.

6    The Bosnian government has made clear that we have to

7    accept.  And all of that, Your Honor, the mode of attack

8    in particular, takes this well beyond the realm of the

9    political.

10            So in our view, there simply can be no

11    political offense exception.  Yes, it occurred, these

12    awful offenses in context of a political conflict.  But

13    the fact they are civilians and degrading treatment on

14    which Mr. Nezirovic inflicted them, removes this from

15    the realm of political offense and the Court should

16    reject that as a possible defense for extradition.

17            That's all I have on the political offense

18    exception.  Is there anything else on either issue that

19    I can answer?

20            THE COURT:  No, sir.

21            MR. HEAPHY:  Then I'll reverse it until

22    after Ms. Spence.

23            THE COURT:  Ms. Spence, good morning.

24            MS. SPENCE:  Thank you, Your Honor.  From

25    all of the scholarly reading about treaties in general,

1    list treaties do not do away with duel criminality

2    requirements.  They are in addition to it.  And language

3    in this treaty is the same.  It is a dual criminality

4    and list treaty.  And this is particularly significant

5    because in the list nothing pertaining to assault or

6    wounding was an extraditable offense.

7               So, but for the convention against torture,

8    modification of the treaty making torture an

9    extraditable offense, this wouldn't have been

10   extraditable at all.  That's where ex post facto comes

11   into play.  It doesn't apply to a treaty.  So now his

12   conduct became extraditable but the statute of

13   limitations issue is separate because it's still in the

14   treaty.  It says the statute of limitations.

15              THE COURT:  Other than the Basic Court, has

16   any other court found that the ex post facto analysis

17   applies to a statute of limitations in the way which

18   Basic did?

19              MS. SPENCE:  I have not found a court that

20   ruled either way.  In the Oregon case they weren't

21   arguing under the war crimes statute.  It was either

22   homicide or attempted homicide and the attempted

23   homicide was subject to the five-year limitation.  By

24   implication the government didn't even try to argue that

25   the war crimes statute applied retroactively.  This

1    would seem that a new argument is being presented here

2    in the most recent cases.  So I have not found another

3    court that rules as Kentucky did, but I haven't found

4    any that ruled against them.  The reasoning is

5    persuasive when you look at the purposes of the statute

6    of limitations.  This isn't the statute of limitations

7    in Bosnia.  By the terms of the treaty, it's the.

8            Statute of limitations that would apply in

9    the country to which the request is sent.  That's our

10   statute.

11           THE COURT:  Let me ask you then:  With

12   respect to -- if under the dual criminality analysis,

13   you use the torture statute for purposes of arriving at

14   there is dual criminality, and Mr. Nezirovic doesn't

15   disagree that the ex post facto laws allow you to do

16   that, then the question becomes:  What statute of

17   limitations do you use, if the most closely analogous

18   statute you're now saying can't be used for purposes of

19   the statute of limitations?

20           MS. SPENCE:  That's because you have to look

21   at the entire spectrum of what is happening here.  By

22   making it an extraditable crime, that doesn't make it

23   punishable in the United States under that statute at

24   the time it occurred.  That's when dual criminality

25   comes in.  Because their interpretation is broad, they

1    are not limited to extraditing him just for torture.

2    They can extradite him for any torture-related crimes

3    that describes the same behavior that was unlawful in

4    this country at the time it occurred as the treaty

5    requires.  That's the dual criminality side of it.

6              So even though torture is extraditable, our

7    statute didn't exist at the time but other statutes

8    punishing the same type of behavior did exist, and they

9    can be applied.  And that's why the statute of

10   limitations is applicable to those crimes is the one

11   that would have to apply, not the statute of limitations

12   applicable to a crime that wasn't a crime in this

13   country at the time it had to be committed in order to

14   fall under the treaty.

15             THE COURT:  So the convention against

16   torture was passed in '94?

17             MS. SPENCE:  Yes.

18             THE COURT:  So if the extradition request

19   came in, in 1999 let's say, even though he would have

20   been extraditable under the torture statute and all the

21   statute of limitations, if you take the eight year would

22   apply, he still couldn't be extradited because the

23   statute of limitations would have expired for all

24   assault-based offenses.  That might satisfy the dual

25   criminality analysis.

```
1              MS. SPENCE:  That's correct.  I would argue
2    the eight-year statute could not apply.
3              THE COURT:  But has any other case, and I
4    don't know the answer to this so I'm asking, that uses
5    one statute for purposes of establishing dual
6    criminality and then says we can't use that statute then
7    for the analysis of whether the prosecution could still
8    occur in the United States?
9              MS. SPENCE:  I have not seen any case other
10   than Basic, which the issue of whether or not an offense
11   is extraditable within the terms of a treaty and whether
12   the statute of limitations is an issue at the same time.
13   All of the cases cited by the Government discussing ex
14   post facto involve treaty amendments that made an
15   offense extraditable, whether it was a bankruptcy case
16   in Oppenheim or anything like that, that could change to
17   the treaty, or the changes to the law that made it fall
18   within the treaty was the substantive offense that the
19   statute of limitations wasn't an issue.
20             THE COURT:  Right.  When the Basic Court
21   made its holding that ex post facto law applies to the
22   substantive analysis of the statute of limitations, he
23   didn't cite any case.
24             MS. SPENCE:  There are no cases against it
25   or no cases in agreement with it.  There are just no
```

1    cases.

2              THE COURT:  And this is the thing I love

3    about the Basic case; that is, that both you love it and

4    both of you hate it.  The reason being is because if

5    that judge is right, and you apply the ex post facto

6    law, then why can't I then follow, if I follow Basic

7    with respect ex post facto, why do I not then follow

8    him, the judge, in finding that the exact same document

9    that's before this Court from January of 1993 was a

10   charging document?

11             MS. SPENCE:  Because the arguments made in

12   that case were not the ones that we are making now.

13   They were not made for whatever reason.  The one I'm

14   making now have been followed by other courts that it

15   was not a charging document.

16             THE COURT:  Do we know they weren't made or

17   just that the Court didn't address them?  I haven't

18   looked at the briefs to know whether those arguments

19   were made.

20             MS. SPENCE:  There are some actual cases

21   discussing and there is one from Eastern District of

22   Virginia:  In The Matter of Extradition of Dwakel.  That

23   held that basically a police report, no matter how

24   thorough, is not the functional equivalent of an

25   indictment, Information or arrest warrant.  That's what

1    we have here.  It looks exactly like the same type of

2    very thorough reports that ICE, ATF, DEA or FBI would

3    send to the United States attorneys listing what

4    happened, who the victims were, who the witnesses were,

5    and what the documents were, but then to make the

6    decision to proceed to bring the charge.  That's what

7    this letter from the head of the police agency, which is

8    part of the military for the Republic of Srpska, before

9    the Republic of Srpska was a recognized entity, alleged

10   it's a police report.  Although, however thorough it may

11   be, it is not the functional equivalent of an

12   indictment.

13          In addition to the Eastern District of

14   Virginia, another court holding that a police report is

15   not enough would be the District Court of New Jersey, In

16   The Matter of Extradition of Betrand, which is cited in

17   brief.  And also, In the matter of Assarsson, which is a

18   Seventh Circuit case, 635 F.2d 1237.

19          The magistrate judge in Kentucky did not

20   benefit from hearing those case cites or hearing that

21   argument.  I suggest that had he heard them, he probably

22   would have ruled differently.  Because they got involved

23   in a dispute over whether or not all the victims had

24   been listed in that report; whether or not the same acts

25   had been alleged in that report.  They didn't dispute

1    that it was a charging document.

2              THE COURT:  Well, can I look into Bosnian

3    law as to what is a charging document?  There is a 2010

4    Michigan State Law Review page 103.  It talks about --

5    the title of it is Statutes of Limitations and

6    International Extradition.  I thought it might be

7    relevant.  In dealing with this initiation of criminal

8    proceedings, it says:  When considering a foreign

9    request for the extradition of a fugitive, it is often

10   not feasible under 3282 to apply common law concept

11   reflecting the initiation of criminal proceedings such

12   as the return of the indictment or the filing of an

13   Information.  Because the foreign country making the

14   request often operate under criminal justice systems

15   rooted in civil law traditions.

16             It says:  As a result in determining whether

17   the five-year limitations appeared under 3282 has

18   expired, the inquiry undertaken by the courts focused on

19   whether a prosecution has been initiated under the

20   foreign country's laws.

21             Once I get an affidavit from the prosecutor

22   in Bosnia that says this is the way we start our

23   proceedings.  Can I look behind that?

24             MS. SPENCE:  Yes.  The Eastern District of

25   Virginia magistrate judge said the bald assertion of the

1    prosecutor alone is not enough as to what constitutes a

2    functional equivalent.  What you also have to do is look

3    at everything else in context; that is, an arrest

4    warrant.  They've issued arrest warrants.  The arrest

5    warrant has been the guiding document in the Oregon

6    case.  The arrest warrant was the guiding document that

7    was looked at in almost all of the other cases.  I guess

8    they are now trying to shift it backwards, because they

9    are now working on cases that arrest warrants were not

10   issued.  The arrest functional equivalent of an

11   indictment or an arrest warrant.  The Seventh Circuit in

12   addressing an extradition request from the Swiss courts

13   note that the presence of an arrest warrant was

14   sufficient, even if they didn't follow the same kinds of

15   procedures we would have to issue an arrest warrant.  It

16   was an arrest warrant.  Something that said you can

17   detain this person.  The police report was not.

18          THE COURT:  But essentially what the

19   Government's argument is, if I understand it, is that

20   under Bosnian law, this is the way you begin a criminal

21   proceeding, and you can't actually indict him until the

22   person comes back and has an opportunity to be

23   questioned.

24          MS. SPENCE:  That's true.  You can't indict

25   them, but you can still issue an arrest warrant or

1    request an arrest warrant but they did it too late.

2              THE COURT:  But if they didn't do that in

3    '93, does that then make this document absolutely

4    something that this Court can't use for analyzing

5    whether they began a prosecution at that point?

6              MS. SPENCE:  Yes, Your Honor, I would say

7    that it does.  It's just like if the report from the FBI

8    went to the United States attorneys office and got

9    buried under other papers and it just didn't get

10   addressed.  They are not signed by an attorney but by

11   the police chief.  It is not the same as the initiation

12   of a court proceeding.  That's what, in reading all the

13   cases that have analyzed this issue, not just from

14   Bosnia but from other countries.  You look at the nature

15   of who is making the determination, whether it's an

16   independent neutral person, like a judge, or whether

17   it's a police agency.  You look at whether or not the

18   authority to detain or arrest has been issued.  You look

19   at those factors.  Those factors were not created by the

20   1993 police report.  It shows they were under

21   investigation.  But under the international standards

22   for when the statute of limitations tolls, they are not

23   the functional equivalent of an indictment or arrest

24   warrant.

25              We are trying to compare apples and oranges

1    to some extent.  But even under the different systems,

2    there is a difference between a police report and

3    criminal charges, criminal proceedings; a custody order

4    issued by the court, a detention order, an indictment,

5    an arrest warrant.  Whatever you call it, they are

6    different in this country and that country, but they

7    have one.  That's what has been used to toll the statute

8    in the Oregon case and the other cases.  In this case

9    that custody order was not entered in 2003, that arrest

10   warrant.

11            THE COURT:  Let's go back to the ex post

12   facto and what the substantive analysis is that's used.

13   I am looking specifically at the language of Article 7.

14   It says:  Extradition shall not be granted in pursuance

15   to the provisions of this treaty.  If legal proceedings

16   or the enforcement of the penalty for the act committed

17   by the person claimed has become barred by limitation,

18   according to the laws of the country.

19            Now, an ex post facto law, is not -- is that

20   a statute of limitations argument?  It's a

21   constitutional argument.

22            MS. SPENCE:  It's a constitutional argument.

23            THE COURT:  So what I'm trying to wrestle

24   with is whether, if I accept your argument that it's a

25   dual criminality treaty and that I can use the

1   convention against torture for purposes of establishing

2   whether there is duel criminality here.  Do I then use

3   the convention against torture to establish for purposes

4   of trying to determine the statute of limitations?  And

5   Article 7 only goes to limitations.

6              MS. SPENCE:  That's true.

7              THE COURT:  What do I do there?

8              MS. SPENCE:  The limitation in the United

9   States could not be under a statute that didn't exist at

10  the time the offense was committed.  If he were

11  prosecuted in the states, if at all, it would have to

12  have been under an assault or conflict of statute that

13  was in existence at the time the acts were committed.

14  How can you say if the statute has run on something that

15  he couldn't have been charged for.

16             THE COURT:  That's where, and perhaps my

17  mind doesn't fully wrap itself around International law.

18  That's where I have a hard time trying to understand why

19  I can use the torture statute for purposes of dual

20  criminality, but I can't use it for purposes of the

21  statute of limitations.

22             MS. SPENCE:  It's not really for dual

23  criminality as much as it is because it makes it a

24  listed crime.

25             THE COURT:  Right.

1          MS. SPENCE:  Because there was no --

2          THE COURT:  It also has to be a crime in the

3    United States.

4          MS. SPENCE:  That's right; and it is a

5    crime.  It was at the time it occurred just not called

6    torture.  But at the time it occurred it wasn't an

7    extraditable offense.  That's the actions, the

8    underlying actions were criminal, just not extraditable.

9    The treaty was amended against torture to make it

10   extraditable.  So then you have to look at why was it

11   criminal at the time it occurred.  Not because of our

12   torture statute but because of the substantive law on

13   assault maybe.

14         THE COURT:  So it's your argument you can't

15   even use the torture statute --

16         MS. SPENCE:  That's right.

17         THE COURT:  -- for purposes of the dual

18   criminality arm of the analysis that you contend needs

19   to be made?

20         MS. SPENCE:  That's correct.  You can only

21   use it for purposes of getting it in the list crimes

22   that are extraditable in the first place.  And dual

23   criminality is an additional crime.  The dual

24   criminality in that by the fact that the underlying

25   conduct was punishable.

```
1                    THE COURT:  Now, but doesn't Oppenheim go
2       against that argument?
3                    MS. SPENCE:  No, it does not.
4                    THE COURT:  Why?
5                    MS. SPENCE:  Because it was a fraud case
6       that arose -- and it wouldn't have been extraditable
7       under the way that treaty was written until it was
8       considered a bankruptcy offense under that treaty.
9                    THE COURT:  Bank fraud offense.
10                   MS. SPENCE:  Bankruptcy fraud; filing a
11      false statement of assets.  So -- because the bankruptcy
12      code was amended --
13                   THE COURT:  Actually I think it was bank
14      fraud because this was in the 1920s.
15                   MS. SPENCE:  It was 1927 but it was
16      bankruptcy because -- it was new in the United States,
17      bankruptcy, and the code was amended.  I will give you
18      the specifics.
19                   THE COURT:  Actually, I think Ireland had
20      tried to extradite him and he had prevailed.  So
21      Congress went back to work and changed the law.  It
22      became then a crime under -- the statute that then
23      existed on our books, and then he was extradited under
24      the same treaty.  They didn't amend the treaty, I don't
25      believe.
```

```
 1              MS. SPENCE:  Well, Scotland and the United
 2    States, the treaty had been amended in 1905 to include
 3    bankruptcy laws it made criminal by the laws of both
 4    countries.  The fraudulent act occurred in 1924.  The
 5    United States had a bankruptcy code in 1898 but it was
 6    the 1926 amendment that made that particular crime
 7    punishable under the bankruptcy statute, not just under
 8    other items.  The other items weren't extraditable
 9    offenses originally.  But once the crime fell within
10    bankruptcy, it was an extraditable crime.  There was no
11    statute of limitations issue because it was still within
12    the statute of limitations.  That's where this case
13    differs.  If this case had been filed within five years
14    of the conduct of '92, then the statute of limitations
15    wouldn't be an issue.  It wouldn't matter whether it was
16    the torture statute or assault statute or whatever.  All
17    that does is make it an extraditable crime.  Just like
18    in Oppenheim.  It made it an extraditable crime.  It
19    didn't change the statute of limitations.  There is no
20    interaction there of making something illegal that had
21    previously been legal.  That wasn't the issue in
22    Oppenheim.
23              THE COURT:  I mean, the Oppenheim Court said
24    that it simply made clear that it was long-standing
25    conduct that was criminal.
```

1          MS. SPENCE:  Yes.

2          THE COURT:  That was then brought into that

3    statute.

4          MS. SPENCE:  All that did was make it

5    extraditable.

6          THE COURT:  But the alleged conduct here is

7    long-standing conduct that was criminal as well.

8          MS. SPENCE:  And it became extraditable but

9    it didn't change the statute of limitations.  It didn't

10   change the analysis of what under a dual criminality

11   analysis what law would apply.  If there had been no

12   assault laws, then I would be arguing that it wasn't

13   even an extraditable offense because there was no dual

14   criminality.  But it could be punishable just not under

15   the one called torture.  So you have to apply the law

16   that it could have been applied to.  It would be the

17   only reasonable reading of both Article 7 on the statute

18   of limitations of the country the request is addressed

19   to and dual criminality language and the listed offense.

20         THE COURT:  Okay.  All right.  Political

21   offense.

22         MS. SPENCE:  Whether a conduct is incidental

23   to civil conflict is different from whether it's in

24   furtherance of.  That's why both terms are included.

25   Defending oneself and family from a politically

1    motivated attack of necessity is just as political as

2    bringing the attack.

3         THE COURT:  Let's say I agree with you.  Is

4    there then still a distinction to be drawn by a prison

5    guard, who by definition is charged with holding people,

6    essentially off the war field, is there a difference

7    between a person acting as a prison guard and a person

8    when they have prisoners then beating them when they are

9    unarmed and are not presenting an imminent threat to

10   that person, as is alleged here?  Is that incidental to

11   a political situation?

12        MS. SPENCE:  It isn't incidental to it when

13   one looks at the emotionally charged reasons for what

14   was happening.  This was during the very first and

15   second month of the war.  During the very period of time

16   when everything in this town was being bombed; the

17   churches, schools, hospitals, everything.  And the

18   emotional reaction that one might feel and this is where

19   Castioni makes a very good point; what men do in passion

20   in pursuit of political objectives, in this case driving

21   out the attackers, can't really be measured by reason.

22   That's why the question is whether it was related to it

23   or whether it wasn't.  This isn't a case of someone

24   using the state of the economy or state of affairs in

25   the country to go out and loot and claim that that was

1    politically motivated.

2             THE COURT:  Can you say that it's passion

3    when, to a great extent, these acts don't take place on

4    the battlefield.  They take place, in fact, removed from

5    the battlefield in a prison setting where the argument

6    is and the allegations are that they are deliberately

7    motivated simply because a person wasn't an alleged

8    enemy combatant.

9             If you're argument is right, wouldn't it be

10   true then that the torture of any prisoner is incidental

11   to a political uprising?

12            MS. SPENCE:  It may be with the exception of

13   the way International law defines crimes against

14   humanity.  A crime against humanity is defined as

15   something that is systematic and prevalent and ordained

16   from the top down, if you will, that's part of a

17   pattern, a plan to beat prisoners.  There is no evidence

18   of that in this case.

19            THE COURT:  But doesn't that remove it from

20   the political offense exception, if it's personal?  If

21   it is:  I'm simply mad at these folks that are

22   destroying my town.

23            MS. SPENCE:  No, I don't think that makes it

24   personal.  If he were attacking them, rather than

25   defending against them for only personal reasons, then

 1    it wouldn't be political.  But to be angry over a

 2    political attack that is destroying your life, I think

 3    it's both personal and political.  The personal aspect

 4    of it keeps it from rising to a crime against humanity.

 5    It's not something that he was allegedly directed to do

 6    by higher-ups.

 7            THE COURT:  Does it matter that these

 8    persons are civilians or alleged to be?

 9            MS. SPENCE:  As Mr. Heaphy noted under the

10    law, even if they were uniformed prisoners, uniformed

11    military men, once they became prisoners, they are

12    quote, civilians for purposes of the non-torture.  So,

13    no, I don't think it matters.  It is true that they were

14    prisoners.  It may even be true that the conduct alleged

15    would amount to torture but it does not arise to crimes

16    against humanity that would put it outside of the

17    political offense exception.  If it did, we would be at

18    the point where the political offense statute might as

19    well not exist.  And maybe that's where we're headed but

20    for right now it is still in there and it is a political

21    offense.

22            THE COURT:  Doesn't your argument almost do

23    the opposite; and that is, make all conduct, if it takes

24    place as a result of the civil war, it makes all conduct

25    fall within the political offense?

1            MS. SPENCE:  No, and I'll tell you why not.

2    That's because of the facts that happened in this case

3    that Doctor Dahlman testified about.  When he was

4    talking about the equivocation -- on page 61 of the

5    transcript.

6            The equivocation of all sides being equally

7    guilty of starting the war and equally guilty of

8    atrocities during the war, and so on, which was created

9    by the Bosnian Serb leadership -- Serbian and Bosnian

10   Serb leadership to hide that they were the clear

11   aggressors at the start of the war.

12           When we look at the facts and look at the

13   evidence, and look at the cases thus far, only the

14   organized plans that we can see, the only plan for

15   organized violence and ethnic cleansing, begin with

16   started with the breakaway Bosnian Serb armed forces,

17   the Bosnian Serb army and the Croatian Serb army, such

18   as they became; that they had planned to conquer

19   territory through these forms of violence.  That much is

20   clear.  And that, by and large, accounts for most of the

21   atrocities that are known to have existed during the

22   war.

23           If we look at the number of killed and

24   missing, we clearly see the targets of the Bosnian Serbs

25   were the ones who were disproportionately harmed by the

1  war.

2          Then he goes onto say:  That other forces

3  occasionally engaged in activities that have been

4  described as war crimes, but they were smaller in scope

5  and not part of the larger campaign.

6          THE COURT:  I think that Mr. Heaphy's

7  response to that is that satisfies the first prong and

8  then the second prong which the Ordinola Court talks to

9  as much as anything else is the subjective purposes

10  behind the alleged actions by Mr. Nezirovic.  When you

11  look at his testimony, Mr. Heaphy is right, is he not,

12  that Mr. Nezirovic testified that he chose the side that

13  he chose to protect his family?

14          MS. SPENCE:  That's because the other side

15  was attacking his family.

16          THE COURT:  Right.  But he chose to protect

17  his family and that's the reason that he joined the

18  army, and he had been on the front lines and then he

19  came back and he was in the prison camp.  He didn't have

20  a political banner necessarily he was raising.  He was

21  doing whatever was necessary to protect his family.  So

22  that then gets to the question of:  Does that then make

23  this political conduct as opposed to survival?

24          MS. SPENCE:  I would say there is not much

25  of a difference when you are the ones being attacked.

```
 1    It might be different if you're the attacker and it's

 2    personal as opposed to political.  But when you're

 3    defending your family, your town, your way of life, it's

 4    personal and political.  And, no, I don't think that his

 5    testimony makes it any less political just because he

 6    acknowledged the personal stake in it.

 7              THE COURT:  I think you may be right with

 8    respect to acts that occur on the battlefield, if he's

 9    alleged to have killed one or more enemy combatants.

10    The question then becomes:  Does that political

11    motivation continue once you go into a prison setting

12    and don't have an imminent danger that is facing you?

13    And the allegation is that persons are selected because

14    of their ethnicity and beaten.

15              MS. SPENCE:  That wouldn't be fair to say

16    they are selected for their ethnicity when the people

17    who were trying to do the ethnic cleansing were the ones

18    with the bias and attacking them.  His wife is half

19    Serbian.

20              THE COURT:  If the allegation was that Mr.

21    Nezirovic had, in this conduct, killed a prisoner, would

22    the same political offense exception argument apply?

23              MS. SPENCE:  Possibly it could.  In Castioni

24    and in other cases, killings have been held to be

25    political offenses.  And in Castioni it wasn't on the
```

1    battlefield.  It was in the general assembly room where

2    the crowd had broken through and were being rallied and

3    they were angry.

4              THE COURT:  In a political forum.

5              MS. SPENCE:  In a political forum.  When

6    you're talking about a war prison, this isn't any

7    regular prison, this is a war prison.  That's just as

8    political forum as anywhere else when you're in the

9    middle of a war.  However much we may not condone

10   torture, and certainly since the days of Nazi Germany

11   our consciousness has been raised significantly about

12   this, but I think what you have gotten in this situation

13   is tantamount to the German Nazis coming around and

14   saying that this Jewish person who beat up those he

15   believed had killed some of his neighbors was a war

16   criminal.  It was politically motivated in defense of

17   his home, family and town.  Even though they were

18   temporarily prisoners of war, they were regularly being

19   exchanged.  That was one of the things that came out in

20   Doctor Dahlman's testimony.  Prisoners were often taken

21   to be exchanged to get other people back.

22             So if you believe these people killed people

23   that were his neighbors and bombed his church and

24   synagogue, and they were going to be leaving again doing

25   the same thing, it's very politically charged.  To say

```
 1   it isn't, is engaging in the highest level of
 2   (unintelligible).  This is a war under circumstances
 3   that I can only imagine from everything I have read and
 4   just that much is horrifying.
 5            The statute of limitations, although, is a
 6   totally separate issue, when you look at the politically
 7   charged situation, both then and now, the statute of
 8   limitations is supposed to serve as something that puts
 9   an end to something and allows healing.  He is not
10   alleged to have committed genocide and killed anyone.
11   This was 20 years ago.  At what point are we going to
12   stop allowing -- and the same thing they did before and
13   during the war, which is the way they were battling on
14   the International stage.  They were trying to argue that
15   they were by right the conquerer of territory and should
16   be recognized.  They were trying to play the victims
17   rather than the aggressors and then try to have it both
18   ways.
19            They have argued repeatedly and failed to
20   honor the International Tribunal prosecutions for war
21   crimes saying war crimes didn't happen.  And then
22   finally saying, yes, they did happen, but we all did it
23   and so let's prosecute everybody.  That's the political
24   context in which this arises.
25            THE COURT:  That's more of an argument that
```

```
1    this is a political prosecution as opposed to the

2    actions are not extraditable because they are political.

3              MS. SPENCE:  That's true but they are

4    interrelated.  It's a political prosecution, because he

5    committed a political offense.  He fought back.  If he

6    had done what so many did and left, he wouldn't be here.

7    He fought back.  Everyone who fought back --

8              THE COURT:  He is not here for fighting.

9              He's here for beating people in a prison.

10             MS. SPENCE:  He's here for fighting back in

11   the way people fought there at that time.  We can't look

12   at it in a vacuum.  The Serbs had already begun ethnic

13   cleansing of his community.  They had already begun the

14   rape camps that they were sending the women to.  They

15   had begun publically killing people just to make a point

16   to leave this area, because they are claiming it as

17   ours.  So what he did in his prison compared to what

18   they were doing in their prisons, you can't say it's not

19   a political offense in context, in the whole context of

20   what was going on.  It was the way they fought.  We may

21   not like the way they fought.

22             As an International community we are trying

23   to move away from that, I grant you.  But to judge him

24   by today's standards for what he did that was political

25   by the standards of the country and time and place where
```

1  he found himself, would be unfair.

2           THE COURT:  Okay.  Thank you, Ms. Spence.

3           MR. HEAPHY:  Yes, Your Honor.  Thank you.  I

4  want to go back to your question before about the Basic

5  Court's authority for its interpretation on the statute

6  of limitations.  You're right, Your Honor, Basic Court

7  cites no authority for its conclusion that the relevant

8  test is to go back to 1992 and examine whether or not

9  there could have been an American prosecution.

10  Absolutely none.  We would suggest that that's

11  obstructive because there is no authority.  It also does

12  not, the magistrate judge does not distinguish the clear

13  way that goes contrary and that is the Oppenheim case,

14  which we've already discussed thoroughly.

15           The Hilario case which was a statutory

16  change, which made it possible to extradite its

17  citizens, not a treaty amendment, not a new treaty but a

18  statutory change that happened in the intervening period

19  between the offense and extradition.

20           The McMullen case.  The fugitive was

21  extradited pursuant to a treaty that hadn't passed and

22  the court rejected an ex post facto challenge.  The

23  extradition proceeding is not a criminal prosecution.

24  Accordingly, (unintelligible) of a successful defense to

25  extradition is not a criminal function.  That's what we

1    are dealing with here; is the statute of limitations as

2    a defense to extradition.

3              In the <u>McMullen</u> Court, while that did(n't)

4    involve a change in the treaty, it explicitly finds

5    correctly, consistent with all that authority, that

6    changes in law which would move the defense to

7    extradition don't get ex post facto.  As the Court said

8    ex post facto is a constitutional protection.

9              THE COURT:  If I find that Mr. Nezirovic is

10   correct that you can't use the torture statute, you're

11   left with the assault statute.

12             MR. HEAPHY:  Right.

13             THE COURT:  Which is five years.

14             MR. HEAPHY:  Right.

15             THE COURT:  Then you have to hang your hat

16   on the 1993 charging document.

17             MR. HEAPHY:  Right.

18             THE COURT:  Because essentially what Ms.

19   Spence's argument is; that is, if in 2010 the United

20   States and Bosnian government amended their treaty and

21   then the United States Congress then subsequently passed

22   a substantive criminal statute, that would have

23   essentially criminalized acts that occurred 20 years

24   earlier that this Court could not look at that and apply

25   some type of ex post facto analysis.  It would be

1    required to send -- whether Mr. Nezirovic is not a

2    United States citizen, but it would be required to send

3    back someone who is legally in this country to face

4    charges for something that was not a criminal act in

5    this country that occurred 20 years earlier.

6            MR. HEAPHY:  Exactly.  That's because this

7    is foreign policy.  We give full faith and credit to the

8    actions of other governments.  This is not an American

9    criminal proceeding at which the constitution applies

10   and people have a right to not be charged with something

11   that wasn't a crime at the time of their offense.  This

12   is a fundamentally separate kind of proceeding.  My role

13   and your role is simply to effectuate, according to the

14   rules which have been set forth in the treaty, at the

15   request from a foreign government.  It's that simple.

16           The DiMenna case, that's a case in which

17   Israel sought to extradite someone for something that

18   occurred before it was even a county; didn't even exist

19   at the time.  The court said, okay, that's fine.

20           THE COURT:  But the treaty does have, when

21   you step back and look at it from a policy standpoint,

22   it has kind of an overarching guide; and that is, no

23   country is going to extradite to the other unless the

24   extraditing country finds that conduct essentially to

25   violate its own --

```
 1              MR. HEAPHY:  Exactly.  We had to enact a
 2   torture statute in order to ratify and be a party to the
 3   convention against torture.  That was part of the rule
 4   the United Nations convention against torture said:  If
 5   you're going join and have this be applicable, you have
 6   to pass a statute under your domestic code that
 7   criminalizes torture.  That's what we did.  We now have
 8   that statute and that's why we are parties to the larger
 9   convention, which provides for extradition to each
10   other.  That's foreign policy.  That's governments
11   negotiating with each other, Your Honor, to exchange
12   wanted prisoners, fugitives.
13              You put your finger on it when you asked Ms.
14   Spence, isn't ex post facto a constitutional protection.
15   The basis of it is in the United States Constitution,
16   doesn't apply.  It's not that kind of proceeding.  Now
17   you're right, there is a limitations period listed in
18   the treaty but the case law Oppenheim, Hilario, McMullen
19   all ignored by Basic, not distinguished.  They didn't
20   distinguish these cases.  Constitutional protections
21   such as ex post facto is not available, not applicable,
22   in an extradition context.
23              It's fine for a government now to say we're
24   going to go back and make it criminal and that's going
25   to allow other countries, because we are complying with
```

the convention of torture to extradite people for things
that weren't crimes under that statute at the time.
Again, even if you go back to DiMenna to a country that
didn't even exist at the time.  That's part of the
reality that we are dealing with here, the limited
nature of this Court's inquiry.  It's a matter of
foreign policy.

          Now, let me move ahead to the 1993 document.
Ms. Spence makes the point that these arguments about
the validity of that in a comparison to the 1993
document to the American system were not made in Basic.
That's just inaccurate, Your Honor.  We did actually
look at the docket sheet, and I would refer the Court to
docket entries 36, 37, and 43.  Those are briefs filed
by the United States in which this very same analysis
comparing the '93 document to the American system with
particularity and the factual allegations was all put
forth before the Court.  Now, the fact that the Court
doesn't go through that analysis as an opinion, is true,
but those arguments were, in fact, briefed to the Basic
Court.  And we would ask the Court to look at those
specific docket entries.

          Now, the Court did in Basic give a cite when
it came to interpretation of the '93 document.  Unlike
this sort of general plain reading question of whether

```
 1    or not you have to go back to '92.  I'm referring the
 2    Court specifically to page 16 of the opinion, at the
 3    very bottom of the page.
 4              It says:  While charge initiation under
 5    federal law requires an indictment or Information, the
 6    BIH system plainly does not aline with American
 7    procedure.  The jurisdiction to jurisdiction translation
 8    calls for some kind of political gymnastics.  The
 9    question becomes whether BIH took an act to formally
10    initiate prosecution such that the Court can find
11    totally to occur during the limitation period.  Then it
12    gives a cite and quotes the Cherry v. Reish case, 1996
13    case, from the Southern District of New York.  In the
14    context of an extradition proceeding where a step is
15    taken in a foreign legal system to toll the statute of
16    limitations that step also tolls the limitation period
17    under US law.
18              So the Court in Basic in contrast to its
19    earlier ruling grounded its conclusion of the '93
20    document and how close it was and its analysis to it
21    cited authority from the Southern District.  Again, Your
22    Honor, that is what the Court should do here.  When you
23    have a Bosnian prosecutor's authoritative opinion that
24    this tolled the statute in Bosnia to the extent it
25    existed, you can't look beyond that.  The statute of
```

limitations to compare it somehow to the American

system, a very different system from the civil law

system in Bosnia, we just can't engage in that.  That

maybe something for the Secretary of State but not for

purposes of limited inquiry before this Court.

Authority in Basic for that is the Cherry v. Reish case.

It's just one of many cases which has held the foreign

government's representations of their own laws.

Now, Your Honor, just finally, the only

other thing I will say, Your Honor, and I don't have

anything to say on the political offense exception.  I

think we have established it.  This proportionality

argument that somehow it's okay.  Their need to torture

them is crazy and is not the law.  That's just civil --

torture of civilians regardless of the context of which

it occurs per se cannot be applicable.  I would submit

on clear authority from the State Department and all the

cases which have so held.

But I will say going back to the statute of

limitations find, if we accept this argument that

somehow we can't extradite someone if an original

prosecution in the country where the fugitive is located

wasn't available, we create a very perverse place for

fugitives committing serious reprehensible acts in other

nations to come here, if there was not a crime existing

1    at that time or to go to any other country, if there was

2    a treaty with this particular statute of limitation

3    argument.  All they have to do is go somewhere it wasn't

4    a crime.

5              THE COURT:  That assumes a very smart

6    criminal who has researched International law.

7              MR. HEAPHY:  But there are plenty of them,

8    Your Honor, who go places where they can't be extradited

9    because they could potentially not be extradited.

10   Again, International law says the countries can go back

11   and say it's okay to extradite for this because the

12   constitution doesn't apply.  That is a sound policy and,

13   if we didn't have that, then it would allow people to

14   selectively choose where we locate and that would create

15   a policy that is unwise.

16             For all these reasons, statute of

17   limitations here doesn't apply.  It's 2340A.  The Court

18   should disagree with Basic and write a better more

19   reasoned opinion on this issue that would be consistent

20   with all of the others.  And the political offense

21   argument, again, it's just inconsistent with law and the

22   Court should reject that issue and certify this to the

23   Secretary of State for extradition, unless they want to

24   submit a proposed order of certification.  If the Court

25   wants, we have some templates from the Department -- I'm

```
1    not presuming how you rule.  If you're interested in a

2    proposed order, we can submit one this week.

3                THE COURT:  Let me get an opinion out.  If I

4    find that's going to be necessary, I will do that.

5                First of all, again, I want to thank

6    everyone for relocating over here on fairly short notice

7    today.  I appreciate the extremely good work that has

8    been done on behalf of both the Government as well as on

9    your behalf, Mr. Nezirovic, with respect to not only the

10   briefing but the argument and presentation of evidence.

11   It is very helpful.  I hope to get an opinion out

12   quickly because it serves all persons interested to be

13   able to do that, and I will.

14               The last thing that I wanted to cover today

15   is I have been working on an opinion with respect to the

16   bond request on behalf of Mr. Nezirovic, and I'm going

17   issue that today.  I am going give you my holding

18   brought out and the basis of it.

19               With respect to bond and an international

20   extradition, I do find that a person such as Mr.

21   Nezirovic must establish by clear and convincing

22   evidence both special circumstances and also a no risk

23   of flight.  The evidence that was in front of the Court

24   in this regard is that -- the primary special

25   circumstance presented by Mr. Nezirovic was that coming
```

1     into the detention setting he suffered from post-

2     traumatic stress disorder.  That that was aggravated as

3     a result of the detention setting that he was in, and he

4     was not receiving or had not received any treatment for

5     that while he was in the Western Virginia regional jail.

6           The evidence also was that Mr. Nezirovic was

7     receiving whatever medications had been prescribed to

8     him prior to being detained, and he continued to receive

9     that in the jail.  Mr. Russell testified, at the Court's

10    request, he came over on short notice and testified to

11    the mental-health treatment that was available to Mr.

12    Nezirovic in the prison setting.

13          Based upon testimony, I did not find that

14    there was a special circumstance as to aggravation of

15    any post-traumatic stress.  I also did not find that

16    there is any special circumstance as a result of the

17    length of these proceedings.  In fact, as I have looked

18    at extradition proceedings, this one has gone about as

19    quickly as many of them or as any have.  I do not take

20    into account what may or may not happen in the event

21    that I find Mr. Nezirovic extraditable.  What may or may

22    not happen with respect to a pending habeas.  I don't

23    know whether that will be filed.  Whether the Secretary

24    of State will certify it, if I find Mr. Nezirovic

25    extraditable.  I don't know what Court -- I know what

1    Court it will land in front of, but I don't know how

2    long it would take any judge to be able to deal with

3    that.  So I'm not going to begin to guess.

4              Then the final finding that I make is that

5    I'm not going to rule one way or another whether there

6    is a substantial likelihood of success.  The cases that

7    I have found that have done that primarily on the

8    probable cause issue.  That there is simply not factual

9    probable cause that's set out in the extradition

10   documents.  So that's not an issue in this case.  This

11   is a case that's going to rise and fall on the legal

12   arguments that we just spent the last hour and a-half

13   discussing.

14             So I am going to deny the request for bond.

15   I will issue an order and opinion on that this

16   afternoon.  You may receive it even before you get back

17   to Roanoke.  I hope to have an opinion out very soon

18   thereafter so this can go wherever it's going to go.

19             Anything else we need to take up?

20             MR. HEAPHY:  No thank you.

21             THE COURT:  Ms. Spence, anything else?

22             MS. SPENCE:  No, Your Honor.

23             THE COURT:  All right.  Very well.  We'll

24   stand in recess.

25             (Proceeding concluded at 11:30 a.m.)

1

2                    CERTIFICATE OF COURT REPORTER

3

4              I, Janelle A. Mundy, Notary Public in and

5    for the Commonwealth of Virginia at Large, whose

6    commission expires July 31, 2016, certify that I

7    reported verbatim the proceedings in the United States

8    District Court for the Western District of Virginia, at

9    Roanoke, Virginia, in the captioned cause, heard by the

10   Honorable Robert S. Ballou, Magistrate Judge of said

11   court, on November 19. 2012.

12             I further certify that the foregoing

13   transcript, to the best of my abilities, constitutes a

14   true, accurate and complete transcript of said

15   proceedings.

16             Given under my hand and notarial seal on

17   this 11th day of October, 2013.

18

19

20                        _____
                          /s/ Janelle A. Mundy
21                        Notary Public for the
                          Commonwealth of Virginia
22

23

24

25